W. C. CHILDREN, Appellant, v. FRANK SHINN, Appellee.

**LIBEL AND SLANDER: Libels per se—Charge of Crime Unnecessary—Presumptions.** Libels *per se*, existing as they may without any charge of crime, carry the presumption of (a) falsity, (b) damages, and (c) if not published on a "privileged occasion," malice.

**LIBEL AND SLANDER: Libels per se—What Constitutes.** A publication, referring to the conduct of a public officer, tending to impeach his ability, skill or knowledge and conveying the impression that he was unfit to longer continue in office is presumptively libelous *per se*.

**LIBEL AND SLANDER: Libel of Official Body—Understanding of Readers.** A libel leveled at a board of supervisors as a whole is a libel against each member thereof at the time referred to in the publication. In such case plaintiff, a member of the board, may show by those who read the publication that they understood it to refer to plaintiff.

**LIBEL AND SLANDER: Libel of Official Body—Application to Members.** A libel leveled at a board of supervisors as a whole is a libel of each member thereof except in so far as specific dates thereof show reference to conduct occurring prior to the time a person became a member.

**LIBEL AND SLANDER: Falsity of Publication—Jury Questions.**
5 The question whether the various statements of the publication are false or true was for the jury in the instant case.

**LIBEL AND SLANDER: Privileged ''Occasion''—Abuse of Privi-**
6 lege—Rule of Privilege. It is for the court to say whether the ''occasion'' on which a libelous publication was made is privileged. It is for the jury to say whether the privilege was abused by defendant—in other words, whether defendant was moved by malice. A public election is a privileged ''occasion'' and the publication itself is privileged, ''if defendant had been *informed* and *believed* that the statements were true and published them without malice and in good faith to the electors for the sole purpose of advising them of the real character and qualifications of plaintiff for the office he was seeking.''

**LIBEL AND SLANDER: Malice—How Determined—Jury Question.**
7 Malice is a jury question. It may be found (a) from the publication itself, (b) from defendant's knowledge of the falsity of the charge, or (c) from other extrinsic circumstances bearing on defendant's objects, purposes and motives.

*Appeal from Pottawattamie District Court at Avoca.*—HON. O. D. WHEELER, Judge.

SATURDAY, JANUARY 23, 1915.

ACTION for libel. Directed verdict for the defendant, and plaintiff appeals.—*Reversed.*

*Killpack & Northrop,* for appellant.

*Turner & Cullison, Genung & Genung,* for appellee.

PER CURIAM: Plaintiff became a member of the board of supervisors of Pottawattamie county on January 1, 1911, and at the general election in the fall of the year 1912 he became a candidate to succeed himself. Prior to his incumbency, the board of supervisors had had a great deal of trouble over the establishment of drainage districts and the changing of water courses within the county, and these difficulties continued during his incumbency. For some reason defendant became interested in the defeat of each and all of

the sitting members of the board, who were candidates for re-election in the year 1912, or who might thereafter become candidates for re-election, and he caused to be published in the Oakland Acorn, of Oakland, Iowa, the Journal Herald of Avoca, Iowa, and the Carson Critic, of Carson, Iowa, all newspapers published in the respective towns in Pottawattamie county, an article from which we extract the following:

"AS A COMMITTEE OF TWENTY-FIVE REPUB-LICANS VIEW THE MANAGEMENT OF THE AF-FAIRS OF THIS COUNTY:

"The following is taken from the records of the district court at Avoca. In the case of *Shinn, Denton and Fenn v. The Board of Supervisors,* relating to the establishment of the Nishnabotna drainage ditch No. 10, the supervisors secured themselves to be subpœnaed as witnesses.

"The trial was begun on the 20th day of April and concluded on the 29th day, 1912. The supervisors who were defendants claimed fees as follows: G. W. Spencer, 8 days, 23 miles, $12.30; G. H. Darrington, 4 days, 60 miles, $10.00; W. C. Children, 5 days, 41 miles, $10.35. The court decided the case against the plaintiffs and plaintiffs filed a motion to re-tax this cost on the grounds that the statute expressly provides that parties to an action are not entitled to witness fees and these members of the board of supervisors being parties under the statute, were not entitled to fees, but the court overruled the motion and taxed the above fees to the plaintiffs. The plaintiffs paid the same to the clerk of the court at Avoca.

"In the case of *Pullen, Steinberg & Cassell v. The Board of Supervisors,* tried in the Council Bluffs district court, the same motion was filed in that case, where Spencer, Darrington and Children had claimed witness fees and the court ruled that they were not entitled to fees, being parties to the suit. So we have two rulings upon the question made by the same judge and in direct conflict. The ruling in the Council Bluffs case was made about six weeks after the one made in Avoca.

"Supervisor Darrington filed a bill against the county for committee work which was paid from the general fund of the county as follows: Apr. 21, $4.50; Apr. 22, $4.20; Apr. 26, $5.05; Apr. 28, $6.00. Supervisor Spencer was paid $29.30 from the general fund for committee work on Nishnabotna Extension Ditch No. 10, for the days of April 20, 21, 22, 24, 25, 26, 28 and 29. Supervisor Children was paid $10 mileage and $18 for committee work on the Nishnabotna Extension Ditch No. 10, from the general fund for the dates of Apr. 20, 21, 25, 26, 28 and 29.

"It will be observed that Spencer, Darrington and Children claimed fees for attending the District Court at Avoca, also mileage for the same days that they claim compensation for committee work and mileage. After claiming the witness fees and judgment was entered against the plaintiffs for the same, they directed the clerk, at Avoca, to turn these fees into the general county fund.

"Mr. Children and Mr. Darrington are candidates for re-election and the foregoing statement of facts is submitted to the voters of this county without comment.

"A. The Board of Supervisors have wholly disregarded the law with respect to keeping the proper records of the cost of the construction of bridges and by disregarding the law has made it almost impossible to ascertain what the bridges of the county have cost the taxpayers. If they had kept the bridge record as required by the statute it would be no trouble whatever for the public to ascertain and know what any particular bridge or concrete culvert had cost the taxpayers. The following is the statute that they wholly neglected to observe. Sec. 442, p. 3, of the Code, 1897, reads as follows:

" 'The Board is authorized and required to keep the following books: (Third paragraph) A book to be known as the bridge book, where a record of bridges shall be kept, in a numerical order in each Congressional township, commencing in section one, numbering each bridge; giving location in

fractional parts of section; name the kind of material used for substruction and superstruction; give length and cost of, bridge, and when repaired, to keep a record of repairs and charge it to the bridge; and warrants drawn in payment for erection or repairs of bridges shall indicate the number of the bridge for which it is issued in payment.'

"No entries have been made in the bridge book, although there is one in the auditor's office, since 1903. We give below a sample of claims filed and allowed:

"Concrete bridge, S. E. Corner of Carson, built by Lana, dated Sep. 30, 1909, allowed Nov. 10, same year, $960.00.

"Sep. 30, 1909, Lana files bill against county, between Secs. 27 and 34, Center, 48 In. concrete tile, 44 ft., at $5.50, $242.00.

"Oct. 28, 1910, W. M. Lana, 36-ft. 60-in. reinforced, con. culvert, $5.50, total $198.00.

"Oct. 28, 1910, Lana between 19 and 30, Knox, 52 ft. 48 culvert, $5.50, $286, allowed Nov. 1910. Bill not signed or sworn to.

"Nov. 8, 1910, W. M. Lana, between 8 and 17, Knox twp., 30-ft. cement bridge, $1,198.00.

"Aug. 1, 1910, W. M. Lana, 40-ft. 48 corrugate at $4.00, $160.00.

"Sept. 6, 1910, same at $3.20 near George Dye's.

"During 1909-10 and 11 Lana charged the county $10.00 per M. for handling old lumber.

"Sep. 13, 1909, W. M. Lana, between Secs. 3 and 10, Valley 44 ft. of 48, concrete tile, $5.50, $240.00.

"Oct. 7, 1909, W. M. Lana, between Sec. 11 and 14, Norwalk, concrete culvert, 5x8x55 with wing walls, $1,600.00.

"Jan. 5, 1909, minute book (Record of Board of Supervisors) 11, p. 346. On motion the treasurer is allowed as salary for the ensuing term the sum of $8,500.00 per annum, the same to be in full for salary, deputy and clerk hire, he to turn into the county treasury all fees coming into his hands.

"Minute book 11, p. 563, Jan. 14, 1911. Moved and sec-

onded, that salary of all other county officers, deputies and assistants be placed the same as allowed during 1909, 1910. Carried.

"B.   Tinley & Mitchell were allowed $600.00 as attorneys' fees out of the funds of ditch No. 10 for the trial of the Shinn & Denton appeal case.

"C.   District court record 10, page 479, at Avoca, in case of *Perks v. Board of Supervisors* and Drainage District No. 10. April 19, 1912, 'By agreement it is ordered that the classification and taxation of lands of Frank Perks be reduced as follows:

" 'Lot 3 .Aud. sub. nw. se. 15, 100 per cent to 75 per cent, $285 to $214.75.

" 'Lot 2, Aud. sub. sw. se., 20, 100 per cent to 75 per cent, $380.00 to $285.00.

" 'Lot 4, Aud. sub., se. se., 7.98, 100 per cent to 75 per cent, $151.62 to $113.72.'

"The statute provides that the Board of Supervisors acting as drainage commissioners shall set and hear objections to the assessment of benefits, they fixing a time when they will hear objections and proof and change and modify any assessment of benefits that may seem to them unfair, but we know of no law after they have passed upon assessment of benefits, as they did in the Perks case, and after the matter is appealed to the courts, to permit them to enter into a compromise reducing the assessment, thereby imposing a burden upon all other owners of land within the drainage district.

"The Board of Supervisors are but the agents of the drainage district and are legally and morally bound to protect the interest alike of all landowners within the district.

"When they were considering the matter of the establishing of Drainage District No. 10 and while the board was going over the proposed district viewing it to determine whether it was of public utility, convenience and necessary for them to establish it, and while at Carson they directed the auditor to purchase postal cards and send to each land-

owner, upon which he should vote for and against the establishment of the district. This the auditor did and all of the landowners with the exception of three or four marked their vote on the postal card and mailed them to the auditor. When the cards were counted, there were almost three to one voted against the establishment of the district.

"Mr. Children took the cards into a separate room into the court house and proceeded to estimate the benefits that each landowner would be taxed for and he figured out that those who were in favor of the ditch would be required to pay more than those who were opposed. In other words, he would allow a vote for every dollar that each landowner would be required to pay, putting the lands of those who were in favor in the one hundred per cent class, allowing them 100 votes for each acre of land, and placing the fifty per cent class and lower who were opposed, allowing them 25 and 50 votes.

"It must be remembered at this time that the commissioners the law allows to be appointed to classify the lands and assess the benefits had not been appointed and had not classified the lands and assessed the benefits. By this method he was able to figure out that a majority of dollars was in favor of the establishment of the district, thus defeating the will of a large majority of the individual landowners within the district, assuming that he was competent to judge and determine the benefits that each one would derive from the establishment of the ditch, while the law says that three competent, disinterested commissioners shall do this work.

"But notwithstanding the fact that a large majority of the landowners in the proposed district were opposed to the establishment of the same, believing that the proposed ditch would not carry the flood water and that no benefits would inure to them by reason of its establishment, they established the ditch district.

"D. The flood of last March proved the correctness of the landowners' view that the ditch would not carry the flood

water. When it came to letting the contract for the digging of the ditch, Mr. Lana was permitted to put in two bids, and in his second bid, which is called a catch-all bid, he offered to do the work for one-hundredth of one per cent less than the bid of any other contractor and they let the contract to him.

"E. In letting the contract for the ditch from Avoca to Oakland, the Central Dredge Co. of Cleveland, O., put in a bid that was $8,000 below the bid of Mr. Lana, but they let the contract to Mr. Lana.

"F. The statute provides that 20 per cent of the estimates shall be retained by the Board until the work is fully completed according to the terms of the contract, but Children, Darrington and Spencer have accepted the work on the ditch from Oakland to the Mills County line, paying to Mr. Lana all of the 20 per cent save $500.00. The work has not been completed according to contract and protests were filed by the landowners insisting that the same should not be approved until the work was completed according to the contract. This protest was ignored by Spencer, Darrington and Children, a majority of the Board.

"G. The contract provided that on either side of the ditch there should be left fourteen feet berms, make the bank uniform and level, excavate the ditch at certain depths at different points, all of which Lana has failed to do. At a point south of the Old Carson Mills there is a quarter of a mile where there is rock from one foot to three feet above what the contract fixed as the bottom line of the ditch that Lana should have removed. The following is the final report of the engineer in charge:

"'Council Bluffs, Ia., July 30, 1912.

"'Report of Nishnabotna Extension Ditch No. 10.

"'To the Board of Supervisors of Pottawattamie County, Iowa: Sirs: I have recently made an inspection of the Nishnabotna extension ditch, No. 10, in this county from Oakland to Mills county line. I find the ditch to be in good shape except as follows:

" 'At station 445, the bottom of the ditch is three feet above the established grade and continues at approximately this height back to station 431 plus 40, where it is 3-7-10 feet above the established grade. At stations 341-344 there is a small island and considerable stumps, which condition also exists at station 310. At station 296 there are small points slightly high and at station 58 and station 70 small points protrude into the channel. In case the work is approved by you the contractor is entitled to his 20 per cent retained less the error in calculation of estimate No. 70. Total cu. yards, 712,911.50 at 5.99 cents per cu. yard, $43,703.40. Money allowed by fourteen estimates, $34,162.87. Per cent retained less error $8,540.53.

" 'Respectively submitted,

" 'E. E. Spetman,

" 'Engineer in Charge.'

"H. As before stated, they retained $500 of the 20 per cent to complete the work according to the contract. It would seem they had not the slightest idea of what it would cost to complete the work according to the contract. It would seem they had not the slightest idea of what it would cost to remove the rock at Carson and to make the banks uniform, clear out the stumps and logs that have fallen into the ditch caused by the flood last March, which will cost thousands of dollars to put the ditch in the condition required by the contract.

"I. Frank Shinn has brought suit on behalf of himself and many other landowners within the district to cancel the certificates issued by the Board in final payment to Lana for excavating the ditch and he asks judgment for any damages that may result to the landowners by reason of the Board accepting the work before it was completed according to the contract against Spencer, Darrington and Children, Supervisors, Coe and True having opposed and voted against accepting and approving the work.

"He also asks the cancellation of certificates amounting to $140.00 that was issued to Turner & Cullison for their

services in the trial of the Johnson Mill damage appeal, these attorneys having been employed by parties who favored the establishment of the ditch.

"B. The Board of Supervisors having employed Attorney Killpack to represent the district in the trial and the certificates were issued to him in payment for his services in the trial of the case. The landowners of the district think that the Board have been very reckless in the employment of lawyers and taxing up their fees to the drainage district. They have allowed Mr. Killpack's attorney's fees regularly for everything he did, he being regarded as especially qualified to try ditch cases, having experience not only in this county but in other counties, but yet they employed Mr. Mitchell of Council Bluffs, and paid $600.00 which the landowners of the district must pay.

"J. The court record shows that every appeal case for damages was decided against the board, claimants getting about three times as much as the appraisers and Board allowed them.

"K. Mr. Lana was awarded by the Board the contract to dig the ditch from Avoca to Oakland, known as Nishnabotna District No. 5, at 9.4 per cubic yard. He was also awarded the contract to dig the ditch from Oakland to the Mills county line at 5.99 per cubic yard. When he had completed the work to the Mills county line certain citizens owning lands along the river in Mills county petitioned the board of that county to establish a district. After a full and fair trial before the Board they refused to establish a drainage district. Those owning lands through which the river run, with the exceptions of two or three men, were so enthusiastic and determined to straighten the Nishnabotna river, that they bought the lands of those who were opposed and then entered into a private contract with Mr. Lana to continue his dredge on down the river five miles.

"L. They contracted for a larger ditch and those interested say that he is digging it for three and one-half cents

per cu. yd. A comparison of the estimates of these three
drainage districts will show that the landowners from Avoca
to Oakland have paid Lana for his work of digging their ditch
at the rate of $19,000.00 more than the Mills county people are
paying and that the landowners from Oakland to the Mills
County line have paid about $4,000.00 more than Mills county.
A recital of the above and foregoing facts need no comment
from the writer of this.

"BRIDGES.

"The figures relating to the improvement of the public
highways that are given herein were obtained by an examiner
of the auditor's office employed by a committee of Republicans
who is preparing this paper to present to the voters of this
county. He had great difficulty in finding the cost and expen-
diture of bridges for the reason that the Board of Supervisors
had wholly neglected to keep a record as required by Sec. 442
of the Code of 1897, but by diligent efforts he has made dis-
coveries of the cost of culverts.

"M. The contract bridge southeast of Carson has been
measured and the following are the measurements. The walls
are 1 foot. 8x12; 8x12; 8x12; 8x12; 12x20; 12x20; 6x12;
6x12; 6x20; 6x20.

"Now the reader can do his own figuring as to the number
of cu. yds. in this bridge. The expert concrete engineers at
Ames testified in the Clinton county supervisors cases that
$7.50 per cu. yd. was fair pay for concrete work. Three dif-
ferent men who do concrete work in the east end of this
county say they do this work for 27 cents per cu. foot and
furnish all the material. The reader can now figure out the
cost of this bridge and determine whether the Board of Super-
visors have been careless in paying Mr. Lana $960.00 for its
construction.

"It will also be seen by reference to the concrete tile
referred to herein that Mr. Lana has used in the construction
of culverts, he has charged the county $5.50 a foot, while
Supervisors Coe and True are now buying the same tile for
$2.85 delivered at any point in the county.

"N. No business man would think of conducting his business in the manner in which the Board of Supervisors of this county has conducted the county business. Their own bills that they filed for committee work are not itemized. They just simply say 'Committee work $29.30,' or name the day and amount. They do not tell the public where they do this committee work. We are sure that no banker, merchant or farmer would pay bills that were not itemized showing specifically what services were rendered.

"It seems very strange that the Board has not invited competitive bids for the construction of concrete culverts costing from $250.00 to $1,600.00. It would seem that Mr. Lana would go out without plans or specifications and build a concrete bridge, come back and file a little strip of paper, 'Concrete bridge, S. E. city of Carson, $960.00.'

"A. If the law had been followed by Spencer, Darrington and Children, these three gentlemen being a majority of the board and they are responsible for the present condition of the records in the auditor's office, the taxpayers of this county would then have an opportunity and be able to determine how their business was being managed.

"We hear complaint on every hand that our farms are going up in value and their taxable valuation is continually increasing. One would naturally suppose that the taxable value being increased, the levy would be lowered, but instead the increase in taxes continues to rise along with value.

"The preparation of this paper and the payment for its printing and circulation is the work of a committee of Republicans numbering twenty-five, who for the reasons set forth believe that Supervisors Children and Darrington ought not to be re-elected, but that the qualified electors of this county should at the November election recall them.—Advertisement."

Each of the papers containing this matter had a circulation outside of Pottawattamie county, not only in surrounding counties, but in several of the United States; one paper

having a circulation of 125 copies outside the county; another
of from 200 to 300, and still another of 165.

Plaintiff alleges that the charges, or most of them, had
reference not only to the board but to him personally as a
constituent member thereof, and to have it believed generally
that he, plaintiff, by reason of his participation in the matters
complained of, was an unfit person for re-election to the office
he sought. He further alleged that many of the matters com-
plained of happened when he was not a member of the board,
and that as to other matters he, plaintiff, voted against the
action of the board; but being in the minority, was forced to
submit. Each and all of the charges he alleges to be false, and
that defendant, knowing them to be false, caused the same to
be published maliciously and without any probable cause for
believing the same to be true.

The defendant admitted the publication; that plaintiff
had been a member of the county board of supervisors for the
time stated, and was a candidate for re-election; alleged that
he, defendant, was a citizen and taxpayer of the county, and
interested in its affairs; that he made the publication to
advise the electors of the county as to plaintiff's qualifi-
cations for the office; and that he made the publication without
malice and for the sole purpose of promoting the public wel-
fare.

At the conclusion of plaintiff's testimony, offered upon a
trial of the issues to a jury, the trial court directed a verdict
for the defendant, and plaintiff appeals.

In this state a libel is defined to be ''A malicious defama-
tion of a person, made public by any printing, . . .
tending to provoke him to wrath or expose him to public
hatred, contempt or ridicule, or to deprive
him of the benefits of public confidence and
social intercourse.'' Code Sec. 5086. Any
such publication is libelous *per se*, although
it does not charge a crime, and no special
damages need be alleged or proved. *Call v. Larabee*, 60 Iowa

1. LIBEL AND
   SLANDER:
   libels *per se:*
   charge of
   crime un-
   necessary:
   presumptions.

312; *Halley v. Gregg,* 74 Iowa 563; *Morse v. Printing Co.,* 124 Iowa 707; *Sheibley v. Ashton,* 130 Iowa 195; *State v. Keenan,* 111 Iowa 286; *State v. Cooper,* 138 Iowa 516.

In the first instance, the question of privilege is not involved; nor need the plaintiff prove the falsity of the charges. *State v. Conable,* 81 Iowa 60; *State v. Lomack,* 130 Iowa 79.

If the publication be held to have had reference to plaintiff at all, it referred to his conduct as an officer, and, as we think, tended to impeach his ability, skill or knowledge,

2. LIBEL AND SLANDER: libels *per se:* what constitutes.

and for the purpose of conveying the impression that he was unfit to be continued therein. Such publications are on their face actionable *per se.* *Vial v. Larson,* 132 Iowa 208; *Sanderson v. Caldwell,* 45 N. Y. 398; *Williams v. Davenport,* 42 Minn. 393; *Morasse v. Brochu,* 151 Mass. 567; *Spiering v. Andrae,* 45 Wis. 330; *Eviston v. Cramer,* 47 Wis. 659; *Van Tassel v. Capron,* 1 Denio (N. Y.) 250; *Gove v. Blethen,* 21 Minn. 80.

The rule quite generally obtaining is that words written of one holding an office of profit, charging incapacity or want of integrity, or corruption in office, are libelous *per se* because they render his tenure precarious and are therefore a detriment from a pecuniary point of view. *Alexander v. Jenkins,* 1 Q. B. (1892) 800; *Sharpe v. Larson,* 67 Minn. 428.

One of the main points made in favor of the ruling of the trial court is that the publication does not refer to plaintiff at all, but to the board of supervisors as a class, and that

3. LIBEL AND SLANDER: libels of official body; understanding of readers.

plaintiff cannot recover unless it be shown that he is the one of that class to which the publication referred. It may be remarked in this connection that plaintiff was not permitted to show by several persons who read the article whether or not they understood it to refer to plaintiff and to charge him with being one of the actors. Manifestly the ruling was erroneous. Plaintiff was one of the members of

the board, at least for a part of the time during which the actions of the board were complained of, and he was not excepted from the general charges against the board as a whole. In such circumstances and especially in view of the last paragraph of the article, and of the further fact that he, plaintiff, was then a candidate for re-election, we think it clear that this testimony should have been admitted. Aside from this, however, and taking the article by its four corners, we think the clear implication from it is that what the board did in the respects charged he, plaintiff, as a member of that board, also did. The charges are not against a general class, but against a board of which plaintiff was a member, and the charges were confessedly made to influence voters in exercising their right of franchise.

In such circumstances, the cases hold almost without dissent that a member of the board may maintain an action of libel without showing specifically that the charges were intended to or were by the hearers understood to apply to any specific member of the board of which plaintiff was a member. *Le Fanu v. Malcomson,* 1 H. L. 636; *Ryckman v. Delavan,* 25 Wend. (N. Y.) 185; *Weston v. Commercial Assn.,* 77 N. E. (N. Y.) 660; *Fenstermaker v. Pub. Co.,* 43 Pac. 112; s.c. 45 Pac. 1097; *Gidney v. Blake,* 11 Johns. (N. Y.) 54; *Levert v. Pub. Co.,* 49 So. 206; *Petsch v. Ptg. Co.,* 41 N. W. (Minn.) 1034; *Reilly v. Curtiss,* 84 Atl. (N. J.) 199.

In Reilly's case, *supra,* it is said: "A sweeping charge of misconduct, leveled against a public board without exception, necessarily points the finger of condemnation at every member thereof, though none are named; and every member of the board may maintain an action therefor."

In Petsch's case, it is said: "And while it would have been proper, and perhaps more satisfactory, to have set forth by additional averments matters explanatory of some parts of the charge, we are of the opinion that the language used, including the words 'city hall ring,' assuming this language to be applied to the plaintiff and the others named, may fairly and

reasonably bear the interpretation substantially as charged, viz., that it was intended thereby to stigmatize the plaintiff and the others named as having corruptly conspired together to defeat the comptroller because he stood in the way of unlawful or dishonest schemes of theirs to obtain money from the treasury for their own private advantage, and that it was proper to aver that such was the intent with which the charge was published, and the manner in which it was understood by those who read it. Such averments are to be treated as substantial allegations of fact, which may be made to fix the meaning if there is doubt or ambiguity in the language. 1 *Amer. Lead Cas.* 139; *Goodrich v. Woolcott,* 3 Cow. 239; *Blaisdell v. Raymond,* 4 Abb. Pr. 459; *Gibson v. Williams,* 4 Wend. 324; *Andrews v. Woodmansee,* 15 Wend. 234; *Maynard v. Ins. Co.,* 47 Cal. 209.''

In Levert's case, the court used this language: ''That plaintiff was not named, and that the defendants did not even know that he was a member of the board, is no legal excuse, but may be considered as a mitigating circumstance. The libel not only assailed the corporate action of the board, but impeached the integrity of every individual member who participated in the proceedings.

''The wholesale charge of official favoritism and misconduct pointed to all the members of the board who participated in the proceedings. These gentlemen were citizens of more or less prominence in the community, and their official connection with the Tulane University was well known. It is manifest that the plaintiff, although not named in the libelous publication, was necessarily one of its objects, and it must have been so understood by those who knew that he was a member of the board.''

We have recently affirmed this rule in *Wisner v. Nichols,* 165 Iowa 15, applying it to a plaintiff who was one of a class, rather than a member of a distinct group or board.

Plaintiff was entitled to show that persons who read the article understood it as applying to him, and to claim that it

had reference to his conduct while a member of the board, except as the article itself showed that what transpired happened before he became a member of that body. *Leonard v. Allen,* 11 Cush. (Mass.) 241; *Smart v. Blanchard,* 42 N. H. 137.

II. In this same connection, it will be noticed that the article complained of in a few instances specifies the dates when the transactions occurred, and as to some of these times plain-

4. LIBEL AND SLANDER: libel of official body: application to members.

tiff was confessedly not a member of the board. As to these we think there was no libel; first, because they were shown to be true, and next, because they could not in reason be held to apply to the plaintiff, who was not then a member of the board. Where dates are not given, we think it must be held that they applied to plaintiff's conduct as a member of the board, for unless they did, they would have no significance whatever as bearing upon the object and intent of the writer of the article, or they would be false and untrue as applied to the plaintiff.

III. The truth of the charges was a complete defense to the action. But, as we have already intimated, some of the charges were untrue, for plaintiff was not a member of the board when

5. LIBEL AND SLANDER: falsity of publication: jury question.

the actions complained of took place; and in several instances plaintiff voted against the action of the board. Without pointing out in detail the charges inferentially made against plaintiff, which occurred before he was a member of the board, it may be said that the ditch from Avoca to Oakland was constructed before plaintiff became a member of the board, and he did not vote to let the contract upon a bid of $8,000 more than the lowest one—this defendant knew. Again, the statement as to some of the payments made to Lana were untrue. Plaintiff voted against letting contracts to Lana on a "catch-all" bid, but the charge, as we construe it, is that he voted in favor thereof and was responsible for the conduct of the board in this respect. Again,

plaintiff was not a member of the board when the contract referred to in paragraph "L" of the article was let, so that this was untrue as to him.

But we need not go through the entire article to point out each statement which, upon our construction of the article, was false and untrue. Enough is stated to show that the case should have gone to the jury.

IV. As plaintiff was a candidate for re-election, the occasion was privileged; and the rule in such circumstances, as announced in *Bays v. Hunt*, 60 Iowa 251, 255, is:

6. LIBEL AND SLANDER: privileged "occasion": abuse of privilege: rule of privilege.

"The court directed the jury that if plaintiff was a candidate for office, and seeking the support of the electors at the time the words were spoken, and defendant had been informed and believed that the words were true, and spoke them without malice and in good faith to some of the electors, for the sole purpose of advising them of the real character and qualifications of plaintiff for the office he was seeking, in that case the speaking of the words was privileged, and defendant is not liable therefor. Counsel for plaintiff insists that the instruction is erroneous, for the reason that it is not qualified, as it ought to have been, with the thought that defendant should have reasonable and probable cause, as a prudent, careful man, to believe the words spoken to be true. We are of the opinion that the instruction as given is correct. Belief in the truth of the words, and hearsay, as probable ground for belief, justified defendant in imparting the information in good faith to the electors. *Townshend on Slander and Libel*, 2d Ed. 241 and notes.

"All men, in the gravest affairs, are accustomed to act upon information received from others, which is fully believed by them. In order to justify their action under such belief, the law does not provide a standard by which to measure their credulity. It simply requires an honest belief, which presupposes the exercise of the faculties of the mind

and the knowledge possessed by them as would be done by an ordinarily prudent and careful man.

"*Mott v. Dawson*, 46 Iowa 533, is not in conflict with these views. An instruction given to the jury in that case, to the effect that the defendant 'must have believed the charge, and have good and reasonable cause so to believe as an ordinarily careful and prudent man,' was approved by this court. But it was not ruled that the instruction without the qualification in question, and simply based upon defendant's actual and honest belief, would not have been sufficient. In that form it would have been in accord with the rule above quoted from Townshend on Slander and Libel." See also, *Ott v. Murphy*, 160 Iowa 730.

It was for the court to say whether or not the occasion was privileged, but as the privilege was a qualified one, it was for the jury to say under proper instructions whether or not the defendant abused his privilege. The occasion being privileged, malice will not be presumed, but it may be shown that plaintiff went beyond his privilege or abused it, in which case he is to be held liable. This latter question is for a jury, and malice may be found either from the article itself, the defendant's knowledge of the falsity of the charges, or other extrinsic circumstances bearing upon the defendant's objects, purposes and motives. *Schull v. Hopkins*, 127 N. W. (S. D.) 550; *Hamilton v. Eno*, 81 N. Y. 116, 120; *Nichols v. Eaton*, 110 Iowa 509, 513; *Sunley v. Ins. Co.*, 132 Iowa 123, 12 L. R. A. (N. S.) 91; *State v. Haskins*, 109 Iowa 656; *Prewitt v. Wilson*, 128 Iowa 198; *Cherry v. Leader Co.*, 114 Iowa 298.

7. LIBEL AND SLANDER: malice: how determined: jury question.

Our rule, as announced in *Bays v. Hunt*, supra, is more liberal than that prevailing in many jurisdictions, where it is held that to publish a falsehood of one who is a candidate for office is always in excess of the privilege and therefore actionable. Falsehood being proved, the question becomes one for a jury, under our holdings, of the honesty and good

faith of the defendant and his purpose in making the publication.

For the reasons pointed out, we are constrained to hold that the trial court was in error in directing the verdict. The judgment must, therefore, be and it is—*Reversed.*