JOHN GUNDRAM, Appellant, v. DAILY NEWS PUBLISHING COMPANY, Appellee.

**LIBEL AND SLANDER:** Libel Per Se—Ridicule. It is not libelous
1  *per se* to publish of one and his wife that they are living on cherries but otherwise starving because of having failed in the chicken business; that he had just mortgaged his chicken farm; that he had not said why he didn't eat chicken; that the wife said she wanted to forget chickens, etc.

**LIBEL AND SLANDER:** Libels Per Se—Presumptions—Falsity—
2  Malice—Damages. Libels *per se*—those prohibited by statute—carry, in addition to a presumption of falsity and malice, a presumption of damages; therefore, damages in such a case need not be proved; otherwise, if the libel is not such *per se.*

**LIBEL AND SLANDER:** Actions—Personal Defamation—Libels of
3  Property or Business—Pleading. An action for *personal* defamation by reason of an alleged libel does not charge any defamation, slander or libel of plaintiff's business by an allegation that plaintiff was engaged in the restaurant business and that the defamation of his person tended to injure him in his business.

**DAMAGES:** Speculative Damages—Proximate Cause—Libel and
4  Slander. Evidence as to certain boarders' having left plaintiff's

restaurant by reason of the alleged libel in question held purely speculative.

*Appeal from Pottawattamie District Court.*—E. B. WOODRUFF, Judge.

FRIDAY, MARCH 17, 1916.

ACTION to recover damages for alleged libel. Verdict directed for the defendant below. Plaintiff appeals.—*Affirmed.*

*Thomas Q. Harrison,* for appellant.

*Tinley, Mitchell & Pryor,* for appellee.

GAYNOR, J.—This is an action to recover damages for an alleged libel, published by the defendant in

1. LIBEL AND SLANDER: libel *per se:* ridicule.

its newspaper on the evening of June 17, 1914. The article complained of is as follows:

"Sick o' Chickens; Live on Cherries.
"Gundrams have Chicken, Chicken Everywhere,
"but Not a Bite to Eat.
"The Farm is Mixed Up.

"Living on cherries, but otherwise starving because they have failed in the chicken farm business is the plight told of by Mr. and Mrs. John Gundram, who have just given a mortgage on their 100-Leghorn farm north of the Bluffs.

"They have not said nor have they been asked why they don't eat chicken.

"The ranch has nearly 1,000 thoroughbred Leghorn chickens, well housed. John Gundram bought it last year, taking over a $1,500 mortgage. Mortgage and all was traded to Gus Reading, a Wisconsin man, for some Wisconsin

chicken land and an $800 further mortgage, a few weeks ago.

"The Gundrams claim there was trouble in recording the mortgage, and that more money had been borrowed on the place.

" 'I wish it could be sold, or something done,' said Mrs. Gundram, Tuesday; 'I want to forget chickens.'

"She says they are starving and eating cherries to keep alive. Attorney George Mayne now has a mortgage on the thousand chickens. They were never counted, says Mrs. Gundram."

It is alleged that the article was published with intent to, and that its publication did, deprive plaintiff of the benefit of public confidence and social intercourse, and subjected him to ridicule and contempt among his friends and acquaintances and the general public, and brought him into public disgrace and scandal among his neighbors, friends, acquaintances and business acquaintances; that the statements made in said article so published were wholly untrue, and were published maliciously. The defendant in his answer practically admits the publication of the article, but denies that the plaintiff was injured as claimed, and alleges that the article was published without malice, and without any intent or purpose of injuring or harming the plaintiff.

Upon the issues thus tendered, the cause was tried to a jury. At the conclusion of plaintiff's testimony, the court instructed the jury, on defendant's motion, to return a verdict for the defendant, which was accordingly done, and judgment thereon entered for the defendant against the plaintiff for costs. From this plaintiff appeals, and complains: (1) That the court erred in directing a verdict for the defendant; (2) that the court erred in excluding certain testimony offered by the plaintiff.

On the first error assigned, it is the contention of the plaintiff that the article published was libelous *per se,* in that it subjected the plaintiff to contempt and ridicule, and tended

to deprive him of the benefits of public confidence and social intercourse.

This brings us to the question whether, upon proof of a publication, without proof of special damages, the plaintiff is entitled to have the case go to the jury, on the theory that the article is libelous *per se*. If the article

2. LIBEL AND
SLANDER: libels
*per se*: pre-
sumptions:
falsity: mal-
ice: damages.

is libelous *per se*, then, under the authorities, the plaintiff is not required to prove the falsity or malice in its publication. Both are presumed. Nor is he required to make proof of damages, for such a libel is presumed to cause some injury. See *Prewitt v. Wilson*, 128 Iowa 198; *Morse v. Printing Co.*, 124 Iowa 707. Our statute provides:

"A libel is the malicious defamation of a person, made public by any printing, writing, . . . tending to provoke him to wrath or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse." Sec. 5086, Code, 1897.

This code definition has been held applicable to civil actions to recover damages for libel. See *Stewart v. Pierce*, 93 Iowa 136.

Any publication inhibited by this statute is libelous *per se*, and no special damages need be alleged or proved. See *Children v. Shinn*, 168 Iowa 531, and cases therein cited.

Whether a publication relied upon is libelous within this statutory definition, and is, therefore, libelous *per se*, is always a question for the court. See *Sheibley v. Ashton*, 130 Iowa 195, and cases therein cited.

A libel at common law and under this statute is the malicious defamation of a person. Defamation is defined by Webster as the taking from another's reputation. Words which produce any appreciable injury to the reputation of another are called defamatory; so when we speak of the defamation of a person, the mind at once reverts to the thought that, in the publication, his reputation among men,

his good repute, has been impaired, injured or destroyed; and when we look to the words written or spoken, the inquiry naturally arises: Would the words spoken or written, in their usual and ordinary meaning and import, convey to the mind an impression of and concerning the man, his habits, life, character and conduct, which tends to lessen him in the esteem and confidence of those to whom a knowledge of the written or spoken words is brought? Do they tend to expose him to public hatred, contempt or ridicule, or do they, if believed, tend to deprive him of the benefits of public confidence and social intercourse? If they do, then they are libelous *per se,* and the plaintiff is entitled to go to the jury upon proof of the publication. One who publishes such an article violates not only the letter but the spirit of the statute. If, in the violation of the statute and its inhibition, he exposes a citizen to public hatred, contempt or ridicule, or deprives him of the benefit of public confidence and social intercourse, he must be held to answer for his act. The libel rests upon the thought that he has committed a public wrong, has done an act in violation of the statute, to the hurt of the complaining citizen. He has violated the right of the citizen to remain secure in his good name and repute among his fellows, and to enjoy their confidence and esteem. A publication that tends to take this from him takes one of the most valuable rights, his right to the confidence, esteem and respect of his fellow men. The thought that underlies all inhibitions of this character is that every man is entitled to enjoy the confidence and esteem of his fellow men. One who, by right living and by right conduct, has built up for himself an enviable name among his fellows, and has drawn to him their confidence and esteem, is entitled to retain and enjoy it, and one who wrongfully and maliciously, and without just cause, makes an assault thereon and impairs or injures the same, does a grievous wrong, for which he is answerable in damages.

We are dealing now with libel of the person, and what we have to say has no relation to libel or slanders of property

or business.   These have their proper place in the law, and
are entitled to protection under law.   The
**3. LIBEL AND SLANDER: actions: personal defamation: libels of property or business: pleading.** plaintiff's claim here rests on personal defamation.   It is true that, in his petition, he alleges that he was engaged in a restaurant business, and that this defamation of his person tended to injure him in his business, but this does not charge any defamation, slander or libel of the business.   Nor in the article itself is there any invidious statement touching plaintiff's business, its character or the conduct of it.   These charges as to injury to his business are simply alleged as elements of damage growing out of the personal libel, and cannot be considered as distinctive charges of a libelous publication touching the plaintiff's property, business or trade.

The only witness called was the plaintiff in the suit, and his testimony discloses the following facts:   That on June 17, 1914, he lived in the city of Council Bluffs; that he never
made to anyone the statements set out in the
**4. DAMAGES: speculative damages: proximate cause: libel and slander.** published article, and never authorized anyone to make the statements; that, before the 17th day of May, he had been employed as a cook for Metzger & Co.; that he was running a restaurant at the K. C. House on June 17, 1914; that he had been running that business there for 3 or 4 days before that time.   He was asked this question:

"How many patrons did you have in the restaurant on the 17th of June, customers in that restaurant down there, or just before the article was published?   A.   Well, we had quite a number.   Q.   Could you give an approximate idea of the number?   A.   About close to 100.   A great many of my customers quit me.   After the publication of the article, some of them quit dealing with me.   I don't know how many, but dropped off of me.   None of these patrons came back to me after that time."

He was asked this question:

"How much of the business did you have down there on and prior to the 17th day of June in the restaurant? A. I had a pretty good business. Q. Now tell the jury what, after this article was published, was the condition of your business, and whether you lost any, or what the effect was in regard to that. A. Lost considerable of it. I don't know how many dropped off on me. I lost a dozen in 3 or 4 days. I gave up the restaurant business about three weeks after the 17th of June. I was unable to conduct and operate and maintain my business after the boarders dropped off."

He further testified:

"My attention was called to the article right away after it was printed, the same evening. I was ashamed of myself, that was all; felt like a man with his neck cut off. It broke my heart all to pieces."

This is all the testimony introduced on the trial, and all the competent testimony offered. There is no causal connection shown between the publication of this article and the fact that certain of the plaintiff's boarders left his restaurant after that time. None of these boarders were called. It does not appear whether those who left were regular boarders or transients. There is nothing in the article itself that even suggests a connection between the two. To permit the jury to say that the publication of the article was the proximate cause of these boarders' leaving, and predicate damages upon that finding, would be to turn them loose in the field of speculation without any tangible basis upon which to speculate. See *German Savings Bank v. Fritz*, 135 Iowa 44.

There is no other evidence offered which the plaintiff, even in argument, contends tended to sustain any of the allegations of his complaint touching damages. In fact, there was no other evidence of any damage to the plaintiff offered, other than that which rested upon the mere speculation arising out of the suggested relationship between the article and the departure of plaintiff's boarders. Unless the article is actionable *per se*, the plaintiff, before he can recover, must

allege and prove special damages resulting as a proximate result of the publication. Unless, therefore, the article is actionable *per se*, the court clearly, under this record, was justified in directing a verdict for the defendant.

We have made a careful study of this article, and have concluded, under the rule recognized in *Hollenbeck v. Hall*, 103 Iowa 214, that none of the inhibitions of the statute were violated in this publication. "Such publications may be the subject of just criticism, but its publication does not expose to public hatred, contempt or ridicule, in the sense or to the degree required by the law of libel," and are, therefore, not actionable *per se*. There is nothing in the article as published tending to brand the plaintiff with dishonesty or other conduct or characteristic deserving the contempt and reprobation of right-minded men, or that would in the least tend to alienate his friends, or to "expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse." See *Quinn v. Prudential Ins. Co.*, 116 Iowa 522, and cases collated therein.

The action of the court is therefore—*Affirmed*.

EVANS, C. J., LADD and SALINGER, JJ., concur.