THE FLORIDA PUBLISHING COMPANY, A CORPORATION, *Plaintiff in Error, v.* JOHN P. LEE, *Defendant in Error.*

Opinion Filed October 31, 1918.

Petition for Rehearing Denied December 13, 1918.

1. The general rule is that in the absence of a constitutional or statutory provision to the contrary the truth of an el-

leged libelous publication is a complete defense in a Civil action for libel.

2. In this State, because of the provisions of Section 13 of the Bill of Rights requiring it, in addition to making it appear that the matter charged as libelous was true, it must also be alleged and proved that such matter was published for good motives.

3. Although they should exercise due care in gathering and publishing news, newspapers are not held to the exact facts or the most minute details of transactions since the law only requires that published articles shall be substantially true.

Writ of Error to Circuit Court for Duval County; George Couper Gibbs, Judge.

Judgment reversed.

*Fleming & Fleming,* for Plaintiff in Error;

*L. S. Gaulden* and *Marion B. Jennings,* for Defendant in Error.

WEST, J.—This is an action for libel. The published article which is the basis of the action as appears from a stipulation filed in the case is as follows:

### "MILITARY COURT FINDS YOUNG OFFICER GUILTY

"Violation of 21st and 62nd Articles of War Charged to Second Lieut. J. P. Lee.

"Second Lieut. J. P. Lee, of Jacksonville, former quartermaster and commissary of the First Battalion, First

Infantry, National Guard of Florida, who was tried by a general courtmartial during the recent encampment of the troops at the State camp grounds, on charges of violation of the 21st and 62nd articles of war, was found guilty on both charges and sentenced to pay a fine of $100, the findings of the court having just been made public in general orders to the troops.

"On the first charge, disobedience of orders in violation of the 21st article of war, it was alleged that Lieut. Lee failed to make proper return of moneys realized from a sale of unserviceable tentage, which he had been ordered to sell following survey proceedings, in which the property was condemned as unfit for use for military purposes.

"On charge No. 2, neglect of duty, to the prejudice of good order and military discipline, in violation of the 62nd article of war and Section 695 of the General Statutes of the State of Florida, the allegations were that the officer, who was accountable for certain public military funds and public military property, neglected to account for the funds by rendering a final account current and the public property by rendering a final return of public military property, after he had been relieved from duty as quartermaster and commissary of the First Battalion.

"The findings in the case have been approved by Gov. Park Trammell, who has ordered that the sentence be carried into execution."

The case was tried upon the third and fourth counts of the declaration, other counts having gone out on demurrer. In the third count a part, and in the fourth the whole of the article alleged to contain the libelous matter was set out.

The pleas to the declaration upon which the case was tried were, not guilty; that the article published was true and was published for good motives; that the article was privileged and was published without malice. The charges, specifictaions and proceedings in the court-martial proceedings were set out *in extenso* as a part of the pleas. Upon a trial a verdict was rendered in favor of the plaintiff. A motion for a new trial was denied and judgment was entered for the plaintiff. From this judgment writ of error was taken and the case is here for review. Numerous errors are assigned, but under the view that we have of the case a discussion of many of them will be unnecessary.

The charges upon which the plaintiff was tried in the courtmartial proceedings contains a specification as follows:

"In that Second Lieutenant John P. Lee, Supernumerary List, National Guard of Florida, having in his capacity as Quartermaster and Commissary of the First Battalion, First Infantry, National Guard of Florida, been accountable and responsible for certain tentage pertaining to the headquarters of said battalion, and such tentage having been surveyed and determined to be unserviceable, he did receive a lawful order from the Governor to sell such tentage at public sale and make return of the moneys realized from such sale, which said order was in the form of a letter from The Adjutant General of the State, in words and figures as follows:

        " 'State Arsenal, St. Augustine, Fla.

                " 'September 7, 1912.

" 'From: The Adjutant General.

" 'To Q. M. & Com. 1st Batt. 1st Infty.

" 'Subject: (Property Acctbty.) Sale of condemned Quartermaster's property.

" '1. Referring to the survey held at Jacksonville, Florida, June 7, 1912, upon certain Quartermaster's property pertaining to the Headquarters of the 1st Battalion, 1st Infantry, you are advised that under date of August 27th, 1912, the Secretary of War approved the recommendations of the surveying officer in this case and directed the sale of the condemned Quartermaster's property covered by such survey, which includes:

" '1 common tent.

" '1 ridge pole for common tent.

" '2 upright poles for common tents.

" '3 wall tents.

" '3 wall tent ridge poles.

" '6 wall tent upright poles.

' '3 wall tent flies.

" 'Accordingly the Governor directs that the above listed property be sold to the highest bidder under the conditions and in accordance with the provisions of paragraphs 118, 119 and 120 of the Militia Regulations, 1910.

" '2. This sale should be made after advertising by circulars posted in prominent places and sent to dealers, or others likely to be interested in the purchase of such stores. A specimen from such as you should use for the circular is enclosed herewith, and it is suggested that the circular may be posted in the postoffice as well as the armory and in any other prominent place where it will be seen, and copies sent to persons whom you think would likely be interested.

" 3. Three blank forms are enclosed herewith for the report of the sale, which should be prepared by you in triplicate. You will not fill in the heading nor the certificate at the bottom of the form, but will enter the number or quantity of each article, the proper designation of each article, the name of the purchaser, and the

amount paid, in the appropriate columns, and will then sign each copy of the report on the line above the word "auctioneer." It will not be necessary to employ an auctioneer for this sale, but you will conduct it yourself at such time as may be most convenient for you, allowing ten days' notice of the sale to be given. The sale may be held in front of the armory. You will erase the word "auctioneer" on the form of the report and substitute your official title.

' '4. Upon the conclusion of the sale you will forward the amount realized therefrom together with the three copies of the report duly prepared to this office, when an order will be issued authorizing you to drop this property from your next return.

"'J. CLIFFORD R. FOSTER.'
"did wilfully disobey and fail to execute such order.

"This at Jacksonville, Florida, on or about September 8, 1912."

Upon this specification the plaintiff was found guilty before the courtmartial and the finding was approved by the Governor. It appears that report of this proceeding, copy of which was furnished by the Adjutant General of the State over his signature to the defendant for publication as news, was the basis of the published article.

By Section 13 of the Bill of Rights it is provided that: "Every person may fully speak and write his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions and civil actions for libel the truth may be given in evidence to the jury, and if it shall appear that the matter charged as libelous is true, and was published

for good motives, the party shall be acquitted or exonerated."

We have seen that there was a plea that the article published was true and was published for good motives.

Now the general rule is that in the absence of a constitutional or statutory provision to the contrary the truth of an alleged libelous publication is a complete defense in a civil action for libel. 17 R. C. L. sec. 169; 25 Cyc. 413; Cooley on Torts (3rd ed.) p. 416; Townsend on Slander & Libel (4th ed.), sec. 21; State Journal Co. v. Redding, 175 Ky. 388, 194 S. W. Rep. 301, Ann. Cas. 1918C 332 and note; Courier-Journal Co. v. Phillips, 142 Ky. 372, 134 S. W. Rep. 446, 32 L. R. A. (N. S.) 309; Children v. Shinn, 168 Iowa 531, 150 N. W. Rep. 864; Coner v. Standard Pub. Co., 183 Mass. 474, 67 N. E. Rep. 596.

But in this State, in addition to making it appear that the matter charged as libelous was true, it must also be alleged and proved that such matter was published for good motives. Wilson v. Marks, 18 Fla. 322; Jones, Varnum & Co. v. Townsend, 21 Fla. 431, 58 Am. Rep. 676; Briggs v. Brown, 55 Fla. 417, 46 South. Rep. 325; Taylor v. Tribune Pub. Co., 67 Fla. 361, 65 South. Rep. 3.

The specific statement which it is alleged was libelous is the second paragraph of the published article. A comparison of this paragraph with the specifications in the charge in the courtmartial proceedings against plaintiff, hereinabove set out, will show that they are substantially the same, that is to say, that the published article is a fairly accurate and truthful statement of the charge. The truth, the proving of which would exonerate the defendant, was that the publication was a substantially accurate statement of the charge to which it

referred.   It is not essential in making such proof to
show that the publication was a literal reproduction of
the charge.  Conner v. Standard Pub. Co., *supra;* State
Journal Co. v. Redding, *supra;* Courier-Journal Co. v.
Phillips, *supra.*

The proof on these points consisted of a copy of the
charges against the plaintiff in the courtmartial proceed-
ings which went in as evidence by stipulation of coun-
sel, the testimony of the Editor-in-Chief, who is the active
business head of the defendant company, and the testi-
mony of the City Editor, who prepared the alleged libel-
ous arfticle, the publication of which was complained of.

In the testimony of the Editor-in-Chief is the follow-
ing:

"Relative to matters appearing in the paper, I direct
the policy of the paper, give instructions as to what
the general policy is.  That policy is in positive instruc-
tions which are given to every reporter and to every
desk man that fairness and justice must prevail.  These
instructions are verbal.

"I did not see the alleged libelous article referred to
in this case prior to its publication.   The object of the
publication thereof was simply a matter of news, in the
regular routine way, as all of these documents of that
kind are given to the public, the regular army and State,
after the courtmartial has made its findings, and it is ap-
proved by the Governor, the synopsis or ruling is printed
by the Adjutant General and furnished to the press for
publication, and it was accepted in good faith and print-
ed merely as a news item for the information of the gen-
eral public—no feeling at all.

"I do not personally know the plaintiff in this case.  I
had no knowledge of him prior to the publication of this
article.   I would not know him if I could see him

now. I have never met him. There was no feeling whatever on the part of the newspaper against the plaintiff personally.

"The information based upon which this article was prepared was furnished to the defendant by the Adjutant General. It was mailed to us, just as he mails out all of those official orders. When I say the Adjutant General, the officer to whom I refer is the Adjutant General of the State of Florida, J. Clifford R. Foster, who signs the document. This circular from the Adjutant General's office did not come to my personal attention before it was published. It went to the city editor. I did not see it before this article was pubished * * *

"The policy of the newspaper is not to do any injustice to any one. Not to permit any personal feeling or malice to enter into anything that is written. The city editor, who handles matter going over his desk, repeats those instructions to every writer, and he reads over what is written. If there was any question, any appearance in an article that seemed to be unfair or unjust or showing personal feeling, he would call the writer up immediately and question him, and find out why, and would eliminate from the story. Those are instructions to every writer on the paper."

The City Editor testified that:

"The article was prepared from General Order 31, Exhibit 3.

"I had that article in my possession when I prepared the Times-Union article for publication. The policy which I endeavored to pursue and did pursue in preparing the article for publication was the following of the verbiage of the general order strictly.

"I know the plaintiff in this case. I have known him as much as four years or longer.

"I am an officer in the National Guard of Florida. The position which I occupied on July 27, 1913, was Captain, assigned to duty as Adjutant, First Infantry, National Guard of Florida. I was on duty at Post Jacksonville.

"The office in the National Guard of Florida, which the plaintiff in this case held, was commissioned as Second Lieutenant, and assigned for duty as Quartermaster and Commissary of the First Battalion, First Infantry, National Guard of Florida. That was a part of the regiment of which I was acting Adjutant. I came into personal contract with the plaintiff in my duties as an officer of the National Guard. Our relations were always pleasant and cordial. I never had any row with him of any kind. I had only a very cordial feeling—pleasant feelings toward the plaintiff. The only motive which actuated me in preparing this article was that of line of duty as city editor of the Times-Union. To furnish the readers of the Times-Union in Jacksonville and throughout the State news that I thought was of interest to them. In this instance I wanted to furnish them news of the doings of the National Guard of Florida. As I took it from the official general order that is published to the troops, I believed that communication from the Adjutant General's office to be true. I know of no officer or employee of the defendant corporation who had, at or before the time of the publication of the alleged libelous article, any hatred or ill will or malicious intention toward the plaintiff for the publication of the alleged libel. As to my own feelings in that regard towards the plaintiff, I can say they were only the most cordial feelings. As city editor of the defendant company, I would know if there were any hatred or ill will

or malicious intention toward the plaintiff in the publication of the alleged libel. As to the truth or falsity of the article prepared for publication, I believed it to be true. * * *

"In preparing this article for publication in the Times-Union I tried to furnish the readers of the Times-Union with matter that I thought was news and of interest to the readers of the Times-Union, and to the National Guard of Florida. I tried to have it absolutely correct by following the official orders as issued by the Adjutant General, and I tried to make it fair to the plaintiff. The only motive that actuated me in preparing this article for publication was that it was in line of duty as city editor of the Times-Union. That line of duty would call for me to prepare articles that were true and articles that were fair in the line of duty to the paper by which I was employed—and in the line of duty to the readers, and also to the subject matter of the article.

"My relations with the plaintiff since the publication of this article have been cordial and pleasant. They have been all along up to the present time. He was in my quarters at the Armory on the night of June 21st of this year, this present month. He chatted there with us for a while, came down street with us, watched the parade from at Laura and Duval Streets, and then went over to the drug store at the corner of Adams and Hogan, where we had drinks together, and cigars. I saw him again yesterday, and was conversing with him yesterday on the street. Yesterday, he was going along the street, he passed us, and we spoke, and he stopped and walked to the corner with us, at Hogan and Adams. I have not at any time had any ill will, feeling or hatred or malice toward the plaintiff, before or since the publication of this alleged libel. * * *"

There was other evidence offered by defendant consisting of the testimony of officers and former officers of the National Guard of Florida, and of others, who testified that they were familiar with the matter, to the effect that the relationship existing between the City Editor who wrote the alleged libelous article and the plaintiff was apparently friendly. The plaintiff denied this, but the evidence overwhelmingly preponderates in favor of the defendant.

Upon a request by the defendant the court charged the jury that if they found from the preponderance of the evidence that the article published by the defendant was true and was published for good motives they should find the defendant not guilty.

In view of the great preponderance of the evidence in favor of the defendant and the charge of the court on this point the refusal of the court to grant a new trial upon the ground that the verdict of the jury was contrary to the evidence and the charge of the court was error.

The judgment will be reversed.

BROWNE, C. J., AND TAYLOR, WHITFIELD AND ELLIS, J. J., concur.