LEHAN T. RYAN, Appellant, v. GEORGE A. WILSON, Appellee.

No. 45775.

34

NOVEMBER 18, 1941.

Ryan & Ryan and Ronald L. Ryan, for appellant.

Parrish, Guthrie, Colflesh & O'Brien, for appellee.

BLISS, J.—The plaintiff is engaged in the practice of law in Des Moines, and was assistant attorney general of the state of Iowa from January 2, 1933 to December 31, 1936. The defendant has been governor of Iowa since his inauguration in January, 1939. Sometime during the year 1939, the defendant asked the auditor of the state to appoint examiners from his office to make an examination and investigation of the receivership division of the state department of banking, and to make a report of their findings to the defendant. The auditor appointed from his office, Frank D. Johnson, state examiner, and Nat Buck, a county examiner, and instructed them to make the investigation and report thereon to the governor. Later such a report was submitted to the governor. It begins thus: "Des Moines, January 22, 1940. Hon. George A. Wilson, Governor of Iowa, Dear Sir: In accordance with your instructions we have made an investigation and herewith present our report." It contained 25 pages all related to other matters than the lines referring to the plaintiff. It ended with these words: "Respectfully submitted, Frank D. Johnson, State Examiner." The only part of the report referring to the plaintiff, and of which he complains, is this: "Mr. Ryan, while an Assistant Attorney General of the

State of Iowa, collected a total of $605.00 from the receivership of the Nichols Savings Bank, Nichols, Iowa, for legal service rendered to that receivership. Said services were rendered during the year 1937 while Mr. Ryan was on the Attorney General's pay roll.'' The remainder of the report criticizes other matters in the administration of the receivership division.

The customary meeting place of the executive council of the state was in the private office of the governor. Such a meeting was being held on March 11, 1940. As was the custom, representatives of the press and news associations were present. Some of the reporters knew of the investigation and had been expecting a report for some time. The governor left the council meeting and walked into the outer office where his secretary, John Zug, had his desk. A number of the reporters followed him into this room where the governor was talking to his secretary. He had dictated a letter to accompany a report and was gathering them together preparatory to attaching the letter to the report and sending it to the attorney general. This letter bears date of March 11, 1940, and was addressed to the Honorable Fred Everett, Attorney General, who passed away June 10, 1940. It stated:

''Dear Mr. Everett:

''I am enclosing herewith a report of auditors of their audit of bank receiverships which was recently completed. This is forwarded to you for the attention of your office and for such action as may be necessary.

''Sincerely yours,
''George A. Wilson.''

A reporter for the Des Moines Tribune standing nearer than the others said in substance: ''How about it? Is that the report?'' The governor stated that it was going to the attorney general's office and turned aside to speak to the state auditor who had come into the room. The same reporter persisted, addressing his remarks to Zug: ''Well, it is a public report, isn't it? It was made by public officials on a public matter.'' The secretary said, ''Yes.'' The reporter then said, ''How about it John; can we get this?'' And the secretary said, ''Well, I guess so; it is going to the Attorney General; here it is.'' The reporter then picked up one of the copies of the report and

walked into the other room. The governor then remarked, in substance, that no partiality should be shown and all reporters should be treated alike. Excerpts and summaries from the report—one of them mentioning the Ryan matter—appeared in the Des Moines Tribune that afternoon.

The next day, March 12, 1940, Johnson, who had signed the report, sent to the Governor a letter, which, omitting the salutation, is as follows:

"Dear Sir: Re: Investigation of Bank Receivership Division
"of the Department of Banking, Page 23,
"Lehan T. Ryan—$605.00.

"This letter is to inform you that the above captioned paragraph in our report dated January 22, 1940, is in error.

"Mr. Ryan was paid for legal services to the Nichols Savings Bank in the amount indicated. However, we find that the original check of the pay roll was erroneous and that Mr. Lehan T. Ryan left the employ of the office of the Attorney General on December 31, 1936, while the services for which he was paid were rendered during the period from January 14, 1937, to October 17, 1937.

"We regret this error and hereby assume all responsibility for the misinformation included in our report.

"Respectfully submitted,
"Frank D. Johnson."

Copies of this letter were given by the defendant on March 12, 1940, the day of its receipt, to the same gentlemen of the press, who had received the examiner's report the day before. It received the same publication as the report. On the day of its publication, March 12, 1940, the plaintiff began this action by filing petition and serving notice thereof upon the defendant. In his petition, he alleged:

"That the defendant for the purpose of attempting to deprive the plaintiff of the benefits of public confidence and of business in his profession circulated and caused to be circulated in the Des Moines Tribune and other newspapers a statement stating that while the plaintiff was Assistant Attorney General of Iowa that he received compensation in the sum of $605.00 from the receivership of the Nichols Savings Bank of Nichols,

Iowa, and that for the purpose of attempting to hold the plaintiff up to ridicule and public hatred the defendant gave the said information to representatives of newspapers and press associations in the State of Iowa for the purpose of having the same circulated throughout the State of Iowa where the plaintiff is well known because of his practice of law and holding of office in the said state.

"That the said statement of the defendant was a malicious defamation and was wholly false, * * *.

"That the plaintiff believes that the defendant made the said statements for the sole and only purpose of injuring the plaintiff in his business and profession * * *.

"That the defendant also stated in the press that he was turning the matter over to the Attorney General of Iowa for the necessary action and thus attempting to advise all who read the said statement that the plaintiff was guilty of some criminal act, all of which the defendant knew was false."

By reason of the alleged defamation, the plaintiff demanded judgment in the sum of $15,000. By an amendment to his petition, the plaintiff demanded judgment for $60,000 for "injury· to his reputation $15,000; injury to his good name $15,000; injury to his credit as an attorney $15,000; injury to his practice as an attorney $15,000."

For answer, the defendant admitted that the report containing the statement of which plaintiff complains was made to him, and alleged the circumstances attending, and the reasons for procuring, the examiner's report, the publication of the examiner's letter admitting his error, all as stated herein. The answer denied all other allegations of the petition and its amendment, and denied that anything said or done by the defendant was with any intention of maliciously holding the plaintiff up to public ridicule or hatred or to in any way injure his good name. The answer denied that the defendant caused the report to be published or circulated in the press, and further alleged that he had nothing to do with the preparation of the report, and that whatever he did was in good faith and in discharge of a public duty, performed in his official capacity as governor, and that in requesting the report from the auditor of state, and in the re-

ceiving and transmittal of it to the attorney general, and all of his acts in connection therewith were privileged and in accord with the requirements of the statutes of the state and the duties of his office.

In his reply to the answer, which was filed with plaintiff's motion for new trial, the plaintiff, after denying generally, re-alleged the malicious circulation of the report, and stated that it was not a correct copy of any public record, and that it was not privileged, but if it was, that privilege had been exceeded and abused, taken away and destroyed by the delivery and circulation of said report to the press before its transmittal to the proper officer. He denies that the report was a public record or was ever a part of the records of the state auditor's office, but was a report to the defendant and that he had had ample time and opportunity to ascertain the truth of its statements, and that with these means at hand the defendant recklessly circulated and published the report, and used the ordinary and usual means of state officers in giving matters publicity.

The matters of fact herein stated were brought out at the trial by witnesses for the plaintiff. It appeared by the testimony of the state auditor that the governor had requested him to appoint examiners from his office to make an investigation of the receivership division of the banking department, and to make a report thereof to the governor, and that he had complied with the request. He testified that he was familiar with the duties of his office and the statutes of the state respecting the right of the governor to request and receive such reports. He testified that his office conducts no audit of the receivership division. The news reporter, who first received a copy of the report from the defendant's secretary, testified substantially as stated herein. The attorney general, who had been first assistant to attorney general Everett, to whom the report was delivered, and who succeeded him, testified to the receipt of the report in the office of the attorney general. The head of the receivership division of the banking department testified that the plaintiff had given attention to the Nichols bank receivership while he was an assistant to the attorney general, and because of his familiarity with the matter, he was employed as special counsel for that receivership, after his term of office

expired, and that the payment of the fees to plaintiff as mentioned in the report was thereafter. He testified that the receivership division was a part of the banking department, and that the superintendent of banking, appointed by the governor, was responsible for the proper administration of the division. The comptroller of the state testified that plaintiff was not on the pay roll of the attorney general's office after December 31, 1936; that he made no disbursements for the receivership division of the banking department; that "as far as I know there is no institution under the Banking Department, and I have never ordered or made any disbursement for any other institution under the Banking Department. The institution appropriation is appropriated to the different boards having control of the various institutions. It is appropriated to the Auditor of State, not necessarily for the use of the institution, but it is allocated from the general appropriation for this purpose by the Governor." By agreement of the parties, and by the plaintiff, portions of the examiner's report were introduced in evidence. Plaintiff also introduced one of the final issue of the Des Moines Tribune of March 11, 1940, containing the article about the report composed by the reporter of that paper referred to herein. It is an article of some length containing, in addition to the statement about plaintiff, criticisms of the conduct of several other persons and naming them and giving brief reference to the matters. The administration of the receivership division was criticized in several respects, and recommendations were made to the governor respecting changes therein. The article stated that the governor had ordered the investigation after the superintendent of banking had brought an action to reopen an Iowa City bank receivership. This is a fair summary of all of the evidence material to a disposition of the case.

At the close of the plaintiff's testimony, the defendant moved for a directed verdict. The motion, in substance, alleged that the plaintiff had failed to establish his cause of action by proof of any damages suffered, or that defendant had prepared the report, or was the instrumentality of, or responsible for, its publication or circulation, or that there was any malice, ill will or hatred toward the plaintiff in anything the defendant did, or that the statement complained of was libelous per se,

or in fact, nor did it hold plaintiff up to public ridicule. It also alleged that whatever the defendant did with respect to the examiner's report was done in the performance of the duties and responsibilities of his office as governor, and that he had a right under the statutes of the state to call upon the auditor of state for examiners to make the investigation and report thereon to him, and to transmit the report to the attorney general, and that whatever he did in the matter was privileged. The court sustained the motion.

The plaintiff then moved for a new trial, making the usual allegations that the verdict as directed was contrary to the law and the evidence; that there was no evidence by which the court could find as a matter of law that the statement of defendant was privileged, or made without malice toward, or damage to, the plaintiff, and that if it was privileged it was a question for the jury whether he had not exceeded and abused the privilege; that the statement was libelous per se and both malice and damages were presumed; that defendant had delivered the report to the press before transmitting it to the attorney general and that the question of privilege was for the jury; that there was no showing that defendant acted in good faith; that there is no provision of law for the governor to direct examiners of the auditor's office to investigate the receivership division of the banking department. Resistance was filed to the motion, and the motion for new trial was denied.

The decisive question in this case is whether the statement complained of was a privileged communication. And under the record made, it is our judgment that if it was privileged, it is immaterial whether the privilege was absolute, or qualified, because in either event the plaintiff has failed to establish his case.

I. Reference to some provisions of the Constitution of the state, and to some statutory provisions relative to the duties of the governor and other executive officers mentioned herein will aid in passing upon this matter of privileged communications. Sections 1, 8, and 9 of Article IV of the Constitution are, respectively, as follows:

"Governor. Section 1. The Supreme Executive power of this State shall be vested in a Chief Magistrate, who shall be styled the Governor of the State of Iowa."

"Duties of governor. Sec. 8. He shall transact all executive business with the officers of government, civil and military, and may require information in writing from the officers of the executive department upon any subject relating to the duties of their respective offices."

"Execution of laws. Sec. 9. He shall take care that the laws are faithfully executed."

Sections of the Iowa 1939 Code, to wit:

"84.03 Governor. The governor of the state shall have:

"1. Direct and effective financial supervision over all departments and establishments, and every state agency by whatever name now or hereafter called, including the same power and supervision over such private corporations, persons and organizations that may receive, pursuant to statute, any funds, either appropriated by, or collected for, the state, or any of its departments, boards, commissions, institutions, divisions and agencies.

"2. The efficient and economical administration of all departments and establishments of the government.

"3. The initiation and preparation of a balanced budget of any and all revenues and expenditures for each regular session of the legislature."

"84.28 General supervisory control. The governor and the state comptroller and any officer of the office of state comptroller, hereinabove provided for, when authorized by the governor, are hereby authorized to make such inquiries regarding the receipts, custody and application of state funds, existing organization, activities and methods of business of the departments and establishments, assignments of particular activities to particular services and regrouping of such services, as in the opinion of the governor, will enable him to make recommendations to the legislature, and, within the scope of the powers possessed by him, to order action to be taken, having for their purpose to bring about increased economy and efficiency in the conduct of the affairs of government."

The auditor of state, as his name indicates, is the chief officer of the state authorized to audit or examine the accounts

of every state office, department, agency, or authority charged by law with the receiving or expenditure of public money. (Section 101.1.) He has at all times in his office and under his control examiners and accountants of recognized skill and integrity, under bond, subject at all times to the direction of the auditor. (Section 114.) He shall make or cause to be made and kept on file in his office all audits and examinations, showing the condition of any department examined, or whether in his opinion its funds have been properly and efficiently expended, the business efficiently conducted, a report of all illegal or unbusinesslike practices, recommendations for greater simplicity, accuracy, efficiency or economy. (Sections 101.2, 101.4.) He shall make annual and biennial reports to the governor and general assembly, and individual audit reports giving the results of all examinations and audits of all departments and establishments and all fiscal officers of the state. (Sections 130.4, 130.7.)

As chief executive officer of the state, the defendant, under the Constitution of the state, and by statute, had the duty of directly and effectively supervising the finances of all offices, departments, agencies, boards, commissions, institutions, and divisions of the state, and the responsibility for their economic and efficient administration. He was authorized to make inquiries regarding the receipts, custody and application of state funds, existing organization, activities and methods of business of the departments and establishments.

Of kindred nature to the power and authority just referred to, he had authority under the provisions of chapter 57 of the Code, to appoint a commission of three accountants to fully examine any state officer, board, commission, or any person expending or possessing state funds, and report thereon to him, which report he might transmit to the attorney general.

He was authorized by the Constitution to require information in writing from officers of the executive department upon any subject relating to the duties of their respective offices. We have noted the broad authority of the auditor of state in examining and auditing all state offices, departments, divisions, and agencies of every kind, and the making and filing of general, and individual reports thereon. Finally, there is the

injunction of the Constitution that "he shall take care that the laws are faithfully executed," and the statutory mandate that he "shall have * * * the efficient and economical administration of all departments and establishments of the government."

Most certainly, the defendant was empowered and authorized to request the auditor of state to direct examiners from his office to investigate the administration of bank receiverships in the department of banking. He might have called upon the superintendent of the banking department for written information in the matter, but it was apparently his wish to have the examination made by accountants outside of the department. He knew of some complaints, and of action taken with reference to a bank receivership at Iowa City.

The responsibilities and the duties of the governor of the state are many and burdensome and important. His days are full days. While he is the chief executive officer of the state, his job isn't a one-man job. In the performance of his manifold duties, he is required to call for and to rely upon the assistance of many other officers and employees of the state. He cannot proofread every report, nor check every detailed statement, nor verify its accuracy, basis, source, or the truth of it. When he, in good faith, believes these reports, and honestly relies upon them, he ought not be held in damages because of some error or inaccuracy therein.

The thought is thus stated in Bays v. Hunt, 60 Iowa 251, 255, 14 N. W. 785, 787, and repeated in Children v. Shinn, 168 Iowa 531, 548, 150 N. W. 864, 869:

"Belief in the truth of the words, and hearsay, as probable ground for belief, justified defendant in imparting this information in good faith to the electors. Townshend on Slander and Libel, (2 Ed.), §241, and notes. All men, in the gravest affairs, are accustomed to act upon information received from others, which is fully believed by them. In order to justify their action under such belief, the law does not provide a standard by which to measure their credulity. It simply requires an honest belief, which presupposes the exercise of the faculties of the mind and

the knowledge possessed by them as would be done by an ordinarily prudent and careful man.''

The rules of law applicable to privileged communications need little comment as they are based upon sound reasons and a wise public policy, and have had the uniform and universal support of both principle and precedent. Speaking generally on the subject, the author in sections 124, 125, 126 on pages 123 and 124 of 33 American Jurisprudence, says:

''On the ground of public policy, the law recognizes certain communications as privileged and, as such, not within the rules imposing liability for defamation. A privileged communication or statement, in the law of libel and slander, is one which, except for the occasion on which or the circumstances under which it is made, would be defamatory and actionable. Privileged communications are divided into two general classes, namely: (1) those which are absolutely privileged; and (2) those which are qualifiedly or conditionally privileged, * * *. An absolutely privileged communication is one in respect of which, by reason of the occasion on which, or the matter in reference to which, it is made, no remedy can be had in a civil action, however hard it may bear upon a person who claims to be injured thereby, and even though it may have been made maliciously. The class of absolutely privileged communications is narrow and is practically limited to legislative and judicial proceedings and other acts of state, including, it is said, communications made in the discharge of a duty under express authority of law, by or to heads of executive departments of the state, * * *. The privilege is not intended so much for the protection of those engaged in the public service and in the enactment and administration of law, as for the promotion of the public welfare, the purpose being that members of the legislature, judges of courts, jurors, lawyers, and witnesses may speak their minds freely and exercise their respective functions without incurring the risk of a criminal prosecution or an action for the recovery of damages.''

In Fleagle v. Goddard, 188 Iowa 1033, 1035, 177 N. W. 51, 52, an action for slanderous and libelous defamation was brought against the defendant because of certain statements about the plaintiff contained in an affidavit, prepared by a special agent

of the United States pension office, after an interview with defendant, and signed and sworn to by the defendant. The affidavit was procured by the special agent in an investigation being made by the pension office respecting some charges against the plaintiff in obtaining his pension. Defendant urged as a defense, that the procuring of his affidavit and its publication was absolutely privileged. A directed verdict for defendant was sustained by this court, upon the theory that if the affidavit was not privileged absolutely, it was qualifiedly privileged and the plaintiff had failed to establish malice. The court, through Stevens, J., said:

"A privileged communication is defined in Newell on Slander and Libel (3d Ed.), Section 492, as follows:

" 'A privileged communication is a communication which, under ordinary circumstances, would be defamatory, made to another in pursuance of a duty, political, judicial, social, or personal; so that an action for libel or slander will not lie, though the statement be false, unless, in the two last cases, actual malice be proved in addition.'

"And in the following section, the principle upon which the doctrine rests is stated as follows:

" 'The great, underlying principle upon which the doctrine of privileged communications rests is public policy. This is more especially the case with absolute privilege, where the interests and the necessities of society require that the time and occasion of the publication or utterance, even though it be both false and malicious, shall protect the defamer from all liability to prosecution for the sake of the public good. It rests upon the same necessity that requires the individual to surrender his personal rights, and to suffer loss for the benefit of the common welfare. Happily for the citizen, this class of privilege is restricted to narrow and well-defined limits. Qualified privilege exists in a much larger number of cases. It extends to all communications made bona fide upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty to a person having a corresponding interest or duty; and the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character, of imperfect obligation. The occasion on which the communica-

tion was made rebuts the inference of malice prima facie arising from a statement prejudicial to the character of the plaintiff, and puts upon him the burden of proving that there was malice; in short, that the defendant was actuated by motives of personal spite or ill-will, independent of the occasion on which the communication was made.' ''

In Morse v. Times-Republican Printing Co., 124 Iowa 707, 721, 100 N. W. 867, 872, the court said:

''Matter which would ordinarily be clearly slanderous or libelous is sometimes published under circumstances which render it privileged, and no action will lie for the recovery of damages. * * * In White v. Nichols, supra [3 How. 266, 11 L. Ed. 591], the opinion * * * which fairly reflects the law on this subject, classifies matter which is thus privileged as follows: ' (1) When the author or publisher acts in the bona fide discharge of a public or private duty, legal or moral, * * *.' ''

In Nichols v. Eaton, 110 Iowa 509, 511, 81 N. W. 792, 793, 80 Am. St. Rep. 319, 47 L. R. A. 483, the defendant pleaded qualified privilege, as the statement complained of was from the medical director of an insurance company to its local agent. The court said:

''Privileged communications or publications are of two kinds: First, absolute; second, conditional or qualified. When the communication is absolutely privileged, no action will lie for its publication, no matter what the circumstances under which it was published. When qualified, however, the plaintiff may recover, if he shows that it was actuated by malice.''

In Mayo v. Sample, 18 Iowa 306, 307, 309, 311, 312, the defendant was mayor of Keokuk, and, as such, ex officio, the head of the police department. An ordinance of the city provided that ''The mayor shall be chief executive officer of the city, and shall take care that the criminal laws of the State and the ordinances of the city are duly respected, observed and enforced.'' Complaints having been made that plaintiff was knowingly buying stolen property from boys, and it being urged upon the mayor that a search warrant be issued and served, he suggested that they first talk to the plaintiff. In this talk, the defendant made

the charge against plaintiff. A judgment for defendant was affirmed. Speaking through Justice Dillon, this court said:

"Words ordinarily slanderous may not be so because spoken by the party in the performance of public or official duty, upon a just occasion, and without malice. (See authorities cited in concluding portion of opinion.) Words thus spoken come within the class of privileged communications; and are not actionable unless express malice be shown. * * *

"Bona fide efforts, made by public officers, in the line of their duty, acting upon information received from others, and without malice, with a view to discover offenders or obtain stolen property, are justifiable and proper. And a charge of crime, in connection with such efforts, where no bad motive exists, and where 'the party acted in good faith, and took no advantage of the occasion to injure the plaintiff's character or standing,' by a malicious attack, is not regarded as slanderous, without proof of malice in fact. * * *

"The verdict of the jury establishes that the defendant did not speak the words charged, if at all, out of ill will, resentment or express malice."

In Rector v. Smith, 11 Iowa 302, 308, the defendant was a member of a grand jury, which instead of indicting the plaintiff, made a report in open court charging him with various misfeasances in office. Since the charge was not made by indictment, the court held that the defense of privilege was not good, but stated:

"The defendant, however, in his answer denies all malice in this publication, and avers that it was made in the discharge of a public duty, and in good faith. If the publication was made without malice, and as the defendant supposed in the discharge of a public duty, and without any ill will or hatred toward the plaintiff, we are of the opinion that plaintiff ought not to maintain his action. Chief Justice Shaw, in the case of Bradley v. Heath [12 Pick. (29 Mass.) 163], says: 'Where words imputing misconduct to another, are spoken by one having a duty to perform, and the words are spoken in good faith, and in the belief that it comes within the discharge of that duty, * * * no pre-

sumption of malice arises from the speaking of the words, and therefore no action can be maintained in such cases without proof of express malice.' "

Perhaps the leading case upon the question of absolute privilege respecting a communication of a public official is the decision of the United States Supreme Court, in Spalding v. Vilas, postmaster general, 161 U. S. 483, 498, 16 S. Ct. 631, 637, 40 L. Ed. 780, 785. It appears that the plaintiff, an attorney at law in the city of Washington, had been active in getting. legislation through Congress for readjustment of the salaries of postmasters. He had many contracts for the collection of these claims. He had many acrimonious controversies with the defendant, who sought in various ways to hinder plaintiff in his collections. He finally sent circulars to about 4,000 clients of plaintiff informing them that no attorney was necessary to procure payment of their claims, and that no power of attorney or transfer of a claim would be recognized. There was no question of his actual malice and ill will toward the plaintiff. In holding that the communication was privileged absolutely, and not beyond the authority of the defendant, the court said:

"We are of opinion that the same general considerations of public policy and convenience which demand for judges of courts of superior jurisdiction immunity from civil suits for damages arising from acts done by them in the course of the performance of their judicial functions, apply to a large extent to official communications made by heads of executive departments when engaged in the discharge of duties imposed upon them by law. The interests of the people require that due protection be accorded to them in respect of their official acts. * * * Whatever difficulty may arise in applying these principles to particular cases, in which the rights of the citizen may have been materially impaired by the inconsiderate or wrongful action of the head of a department, it is clear—and the present case requires nothing more to be determined—that he cannot be held liable to a civil suit for damages on account of official communications made by him pursuant to an act of Congress, and in respect of matters within his authority, by reason of any personal motive that might be alleged to have prompted his

action; for, personal motives cannot be imputed to duly authorized official conduct. In exercising the functions of his office, the head of an executive department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may, at any time, become the subject of inquiry in a civil suit for damages. It would seriously cripple the proper and effective administration of public affairs as intrusted to the executive branch of the government, if he were subjected to any such restraint. * * * But if he acts, having authority, his conduct cannot be made the foundation of a suit against him personally for damages, even if the circumstances show that he is not disagreeably impressed by the fact that his action injuriously affects the claims of particular individuals. In the present case, as we have found, the defendant, in issuing the circular in question, did not exceed his authority, nor pass the line of his duty, as Postmaster General. The motive that impelled him to do that of which the plaintiff complains is, therefore, wholly immaterial. If we were to hold that the demurrer admitted, for the purposes of the trial, that the defendant acted maliciously, that could not change the law.''

In Mellon v. Brewer, 57 App. D. C. 126, 129, 18 F. 2d 168, 171, 53 A. L. R. 1519, Mellon, the secretary of the treasury, was sued for writing an alleged libelous letter to the President, severely criticizing Brewer, who, under authority of Congress, had been fruitlessly conducting an investigation against the department of the treasury, involving alleged fraudulent practices. A demurrer to the declaration having been overruled, the appellate court reversed. The court said:

''The defense of the Secretary is that the communication was privileged, because it was an official communication from the head of an executive department to the President of the United States; * * *

''It thus appears that the efficiency, and to some extent at least the integrity, of the Treasury Department had been seriously challenged, and that public confidence in that department might have been impaired. Not only was the head of the department and the President interested, but the matter was of

vital concern to the public. These charges had been given wide publicity, and it may be assumed that the President desired from the head of the department involved a comprehensive statement of the facts as they appeared to him. Even though the President had not requested such a statement or report, it certainly was not beyond the scope of the Secretary's duty and authority to submit one. * * *

"The motive underlying the discharge of an official duty is not material. 'Public policy affords absolute protection and immunity for what may be said or written by an officer in his official report or communication to a superior, when such report or communication is made in the course and discharge of official duty. Otherwise the perfect freedom which ought to exist in discharge of public duty might be seriously restrained. * * * Of course, when a party steps aside from duty and introduces into his report or communication defamatory matter wholly irrelevant and foreign to the subject of inquiry, a different question is presented.' De Arnaud v. Ainsworth, 24 App. D. C. 167, 178 (5 L. R. A. [N. S.] 163)."

Other cases with similar holdings are Greenwood v. Cobbey, 26 Neb. 449, 42 N. W. 413; Miles v. McGrath, (D. C. Md.), 4 F. Supp. 603; Wachsmuth v. Merchants National Bank, 96 Mich. 426, 56 N. W. 9, 21 L. R. A. 278; Weber v. Lane, 99 Mo. App. 69, 71 S. W. 1099; Lent v. Underhill, 54 App. Div. 609, 66 N. Y. S. 1086.

It is our conclusion that the defendant, in all that he did was acting strictly in the line of his official duties as the governor of the state, and was protected by an absolute privilege. He was fully authorized in requesting the investigation. The examiner was simply performing his duty in making the investigation and reporting. This report was privileged as to him. The report was a public document. It contained matters of a general interest to the public. For the past twenty years, many thousands of Iowa citizens, as depositors, and otherwise, have had a very definite and intense interest in the administration of bank receiverships. Those specially interested, and the people generally, were entitled to know the facts about these receiverships. It was the duty of the governor to give them what information he had. He was authorized, if he saw fit, to

submit the report to the attorney general, but he was also justified in submitting it to the citizens of the state, in the most effective way, by the public press.

There has been considerable discussion in the case as to whether the defendant was an instrumentality in giving pub-licity to the report. It would be the veriest quibbling to say that he was not. He did not request the reporters to publish it, and he did not tell them not to, but he and his secretary made it available to all of the representatives of the press and news associations present. But in this he did not exceed, abuse, or destroy his absolute privilege. As we have stated, he had a right to make it available for publicity, and in doing so he was protected by an absolute and unqualified privilege.

II. But if we are wrong in our conclusion that the privilege was absolute, it was certainly a qualified privilege. In which event there could be no recovery by the plaintiff if the publication was in good faith and without malice. We have many times said so. In Vial v. Larson, 132 Iowa 208, 209, 109 N. W. 1007, 1008, a qualified privilege case, the court said: "But, if the communication is privileged, the imputation of malice is negatived, and the injured party can recover damages only on proof that the statements are malicious. The burden of proving this fact is, under such circumstances, upon the plaintiff. * * * Proof of untruthfulness of the statements would not show that they were maliciously made." See also, Ott v. Murphy, 160 Iowa 730, 739, 141 N. W. 463; Children v. Shinn, supra (168 Iowa 531, 548, 150 N. W. 864); Long v. Peters, 47 Iowa 239, 241; Rainbow v. Benson, 71 Iowa 301, 303, 32 N. W. 352; Sunley v. Insurance Co., 132 Iowa 123, 109 N. W. 463, 12 L. R. A., N. S., 91; Cherry v. Des Moines Leader, 114 Iowa 298, 86 N. W. 323, 54 L. R. A. 855, 89 Am. St. Rep. 365; State v. Haskins, 109 Iowa 656, 80 N. W. 1063, 47 L. R. A. 223, 77 Am. St. Rep. 560.

And the malice which the plaintiff must establish is not legal malice, or malice in law—the intentional doing of a wrongful act without just cause or excuse—as contended by the appellant. But it must be actual malice—malice in fact—express malice. We have so held many times. See Ballinger v. Democrat Company, 203 Iowa 1095, 1098, 212 N. W. 557;

Flues v. New Nonpareil Co., 155 Iowa 290, 295, 135 N. W. 1083, Ann. Cas. 1915A, 33; Plecker v. Knottnerus, 201 Iowa 550, 554, 207 N. W. 574; Nichols v. Eaton, supra (110 Iowa 509, 512, 81 N. W. 792, 47 L. R. A. 483, 80 Am. St. Rep. 319); Mayo v. Sample, supra (18 Iowa 306, 312); Fleagle v. Goddard, supra (188 Iowa 1033, 1035, 177 N. W. 51); Rector v. Smith, supra (11 Iowa 302, 308). Such malice may be proved by evidence extrinsic to the publication sued upon, or inhering therein. No evidence of any kind respecting the relations of the parties was offered. So far as the record shows, these relations were not otherwise than pleasant and friendly. There are no presumptions which aid the plaintiff in any way. It is hardly reasonable to suppose that the investigation was instituted to injure the plaintiff. No such thought has been suggested. And in all likelihood, the defendant never anticipated that the plaintiff would in any way be involved. There is no basis for thinking so. That he was involved was due to an error of the examiner, for which the defendant was in nowise responsible, or at fault. The fact that the examiner immediately admitted the error and assumed all responsibility upon discovering it, and that the defendant at once gave to the retraction as wide publicity as the report, is opposed to any malicious intention.

A complete answer to any claim for damages is found in the fact that since no actual malice is presumed and none was proved, there is no presumption of damages, and the plaintiff offered no proof of damages. Appellant urges that the report was per se libelous. Whether it is or is not per se libelous has nothing to do with the case. Whether a defamation is libelous per se, or per quod, is wholly immaterial and in no way aids a plaintiff, where the communication is either absolutely or qualifiedly privileged, for the privilege renders the defamation innocuous and nonactionable. As said in Ballinger v. Democrat Co., supra (203 Iowa 1095, 1098, 212 N. W. 557), where the article is privileged, it is not libelous per se. And, as written in Savings Bank v. Fritz, 135 Iowa 44, 47, 109 N. W. 1008, 1009, "The defense of privilege goes to the cause of action itself."

This opinion has extended to greater length than we anticipated, but is important to both parties, and able attorneys on

each side have well presented it. It is regrettable that an honorable and distinguished lawyer has had his good name and fame exposed to tarnish even for· so short a ·time as happened in this case, but the possibility of damage is slight. In our judgment, no harm was intended, and no harm was done.

What our great Justice Dillon said in Mayo v. Sample, supra (18 Iowa 306, 310), is applicable here:

"The public have rights, and so have individuals. Rules of law are founded upon good sense and due regard alike to the rights of both the public and the citizen. It not unfrequently happens, however, that an individual becomes, without any real guilt, so surrounded by circumstances as that he must suffer some inconvenience, or even injury, in order that the higher interests of the public, or the community, may be protected by the detection and punishment of offenders."

The trial court was right. The judgment· is affirmed.—Affirmed.

CHIEF JUSTICE and all JUSTICES concur.