Ronald SMITH, Plaintiff,

v.

DES MOINES PUBLIC SCHOOL
SYSTEM, Defendants.

No. 4–98–CV–90368.

United States District Court,
S.D. Iowa,
Central Division.

June 1, 2000.

Elizabeth A. Flansburg, West Des Moines, IA, for plaintiff.

Philip H. Dorff, Des Moines, IA, for defendant.

## ORDER

PRATT, District Judge.

Before the Court is Defendant's Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial filed April 3, 2000. Plaintiff filed his Resistance on April 14, 2000. Both parties have submitted post-trial briefs in support of their respective positions. The matter is submitted.

## I. Factual and procedural background

Following a four-day trial in this defamation case,[1] a twelve person jury found that Defendant Des Moines Public School System ("the District") committed slander per se against Plaintiff Ron Smith ("Smith"), and awarded Smith $250,000 in compensatory damages. At the close of Plaintiff's case-in-chief, and again before the case was submitted to the jury, the District moved for judgment as a matter of law, which motion the Court denied. *See* Fed.R.Civ.P. 50. The District now renews its motion and asks the Court to enter judgement in its favor notwithstanding the verdict, or alternatively to order a new trial. In support of its motion, the District argues that the slander per se claim should not have been given to the jury; that the District's qualified privilege has not been defeated; and that the alleged defamatory statements are true or substantially true as a matter of law. Smith argues that the verdict fully accords with the evidence adduced at trial and all reasonable inferences that may have been drawn therefrom.

To give context to the Court's opinion, the Court will briefly highlight the facts of this case and view them in a light most favorable to Smith as the non-moving party. *See Porous Media Corp. v. Pall Corp.,* 110 F.3d 1329, 1337–38 (8th Cir.1997).

The events giving rise to this lawsuit occurred from July 1995 (when Smith was hired by the District) to August 1996 (when Smith ended his employment with the District). Smith was hired by the District on July 3, 1995 to serve as its technology director. He was to oversee implementation of the district's multi-million dollar computer plan and make recommendations regarding what type of com- puters and software the district should purchase.

The evidence presented at trial included the testimony of several district employees and school board members as well as extensive documentary items. The evidence showed discord between Smith and those who worked with him, including Superintendent Gary Wegenke ("Wegenke"), Assistant Superintendent Pat Moran ("Moran"), and several district secretaries. "Secret files" were ordered kept on Smith and two of his close associates. Amidst the infighting, the technology department which Smith took over was experiencing major problems. Witnesses testified, for example, that computers were missing, stolen, or unaccounted for; inventory controls for computer hardware or software were lacking; teachers were illegally taking computers home; and software licensing restrictions were being violated. Smith's plans for immediate and sweeping changes in the way the District would handle technology matters were not well received by others in the District. His style of leadership was also not favored.

Relations between Smith and his colleagues festered. On July 2, 1996, the situation came to a head. Smith and a District secretary Linda Dinsdale ("Dinsdale") had a physical confrontation in the office. As Smith attempted to retrieve "secret files" that were contained in a file cabinet near Dinsdale's desk, Dinsdale quickly came over to wrest the files away from Smith. As Dinsdale tried to grab the files away, Smith raised his left arm and pushed Dinsdale away, causing a lemon-size bruise to form on Dinsdale's arm.

On July 4, 1996 Dinsdale filed a complaint with the Des Moines Police Depart-

---

1. This action was initially filed in ten counts pursuant to the Court's federal question jurisdiction. Although the retaliatory discharge claim under 42 U.S.C. § 1981 was eventually dismissed, the Court asserted supplemental jurisdiction over the remaining Iowa defamation claim. *See* 28 U.S.C. § 1367(a).

ment alleging Smith had assaulted her. On July 9, 1996, Plaintiff was charged with assault and a warrant was issued for his arrest. He eventually turned himself and later released on bond.

On July 10, 1996, school board member Suzette Jensen ("Jensen") wrote to Wegenke and formally requested an audit of the technology department to assess accountability and controls issues for the management of hardware and software in the district. (Jensen was Smith's closest ally on the board). The Board eventually approved the internal audit and asked the District's internal auditor Reba Job ("Job") to perform the audit.

While the criminal charges against Smith were pending, the district demanded that Smith either resign his position or face immediate termination. In late August 1996, Smith agreed to resign his position. Dinsdale decided not to press charges against Smith. The criminal assault charges were dismissed without prejudice on August 23, 1996.

On August 26, 1996, Smith signed a document called "General Release and Separation Agreement" ("Agreement"). Among other things, the Agreement embodied the terms of Smith's resignation from the District. Smith's resignation was approved by the school board on August 27, 1996. At this board meeting, Wegenke stated: "The incident that took place in early July in the technology office is regrettable. As I said to an assembly of central office staff following the incident: 'I will not tolerate an unsafe workplace for our employees.' .... [T]he settlement with Smith was motivated 'on the district's side of employee safety in the workplace.'" This statement is one of the bases for Smith's slander claim against the District.

In November 1996, Job finished her audit and announced her findings. Job's summary was broadcast on Channel 11 to the city of Des Moines. Job's findings outlined financial and accounting inadequacies of the technology department. Job's audit did not mention Smith by name.

Wegenke's statements at the August 27, 1996 school board meeting and Job's audit form the basis for Smith's slander per se claim against the District.

## II. Legal Standard for Judgment as a Matter of Law

The relevant statute is set forth in Rule 50 of the Federal Civil Rules of Civil Procedure. Rule 50(a)(1) provides in relevant part that:

> If during a trial by jury a party has been fully heard on an issue and there is *no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue,* the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

Rule 50(b) provides that the "movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment-and may alternatively request a new trial ... under Rule 59."

More than a "scintilla" of evidence is required to establish a "legally sufficient evidentiary basis" for the existence of a jury question to avoid judgment as a matter of law; the Court must determine if there is "substantial evidence" supporting a verdict in favor of the nonmoving party. *Johnson v. Cowell Steel Structures, Inc.,* 991 F.2d 474, 478 (8th Cir.1993); *McGriff v. Minnesota Mut. Life Ins. Co.,* 127 F.3d 1410. (11th Cir.1997). In determining whether there is substantial evidence to support the verdict, the Court must review the evidence "in a light most

favorable to the nonmoving party" and "must not engage in a weighing or evaluation of the evidence or consider questions of credibility." *Porous Media Corp.*, 110 F.3d at 1337–38. Judgment as a matter of law is appropriate only when all of the evidence points one way and is "susceptible of no reasonable inference sustaining the position of the nonmoving party." *Id.* As another authority put it, "[t]raditional respect for the jury and its constitutional benison requires that it be allowed to find whatever facts are reasonably suggested by the evidence. The impossibility of defining reasonableness requires that the scope of freedom be left large." Wright & Miller, 9A *Federal Practice & Procedure* 2d § 2524 n. 14 (1995) (quoting Cooper, *Directions for Directed Verdicts: A Compass for Federal Courts*, 55 Minn. L.Rev. 903, 921 (1971)). "The general statements ordinarily adopted by the courts are simply a way of stating that the fundamental tent of [judicial] control must be one of minimum interference." *Id.*

### III. Analysis

At trial, Plaintiff had the burden to prove slander per se by clear and convincing evidence. *See, e.g., Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 507, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). Borrowing from Iowa Civil Jury Instruction 2100.2, the Court set forth the elements of slander per se in Instruction No. 15:

In order for the Plaintiff to recover on the claim for slander per se in this case, the Plaintiff must prove, by clear and convincing evidence, all of the following propositions:

1. The Defendant made the statements.

2. The Defendant communicated the statements to someone other than Plaintiff.

3. The statements would reasonably be understood to be an expression which would (a) attack a person's integrity or moral character, (b) expose the person to public hatred, contempt or ridicule, (c) deprive the person of the benefits of public confidence and social dealings, OR (d) injure the Plaintiff in the maintenance of his business.

4. The Defendant made the statements with "actual malice." The definition of actual malice is contained in Instruction No. 16.

If, however, you find the Defendant has proven the "defense of truth" as that phrase is defined in Instruction No. 17, then that will be a complete defense to the claim of slander per se.

Citing Iowa Civil Jury Instruction 2100.5, *Johnson v. Nickerson*, 542 N.W.2d 506, 510, 512 (Iowa 1996), and *Haldeman v. Total Petroleum, Inc.*, 376 N.W.2d 98, 104 (Iowa 1985), the Court defined actual malice in Instruction No. 16:

The Defendant made the statements with actual malice if the statements were made with ill-will or wrongful motive. Ill-will or wrongful motive may be inferred from all relevant circumstances surrounding the statement.

Actual malice can be shown by proving knowledge of a false statement or reckless disregard for the truth.

Finally, borrowing from Iowa Civil Jury Instruction 2100.6, the Court defined in Instruction No. 17 the "defense of truth," which defense, if proven, absolves the District of all liability. Instruction No. 17 stated:

The Defendant claims the statements complained about are true. The fact the statement is true or substantially true is a complete defense, regardless of bad faith or malicious purpose.

The Defendant must prove the truth of the statement. To do so, the Defendant

must establish the truth of the entire language of the statement, and establish it in the sense attributed to it by the Plaintiff. Slight inaccuracies of expression are not important so long as the statement is substantially true.

If the Defendant has proved the truth of the statements, then the Plaintiff cannot recover. If the Defendant has failed to prove the truth of the statements, then you shall consider whether the Plaintiff is entitled to recover damages in accordance with other instructions.

There is no dispute that the District and its agents, in addressing matters related to the termination of an administrator, enjoy qualified privilege. *See Vojak v. Jensen,* 161 N.W.2d 100, 105 (Iowa 1968). Plaintiff concedes that the District enjoys this qualified privilege.

Defendants base their Rule 50 motion on three grounds. First, Defendant argues that the alleged defamatory statements do not, in and of themselves, attack the integrity or moral character of Smith; therefore they argue that the slander per se instruction should not have been given to the jury. Second, Defendant argues that Plaintiff has failed to make the requisite showing of "actual malice" so as strip the Defendant of its qualified privilege. Third, the Defendant argues that it succeeded in establishing the truth or substantial truth embodied in both Wegenke's statement and Job's internal audit.[2] The Court will address each of Defendant's three points in turn.

### A. *Submission of slander per se claim to jury*

■ Defendants argue that Wegenke's statement that he "will not tolerate an unsafe workplace for our employees.... [T]he settlement with Smith was motivated on the district's side of employee safety in

the workplace" is not, on its face, defamatory per se. They argue that because extrinsic evidence is necessary to show the words' defamatory nature then the words could not be defamatory per se.

■ It is well settled that when a question arises concerning whether a slander per se claim should be submitted to the jury, the court "need only decide whether the statement could reasonably be understood as slanderous per se." *Wilson v. IBP, Inc.,* 558 N.W.2d 132, 140 (Iowa 1996) (citing *Vinson v. Linn–Mar Community Sch. Dist.,* 360 N.W.2d 108, 116 (Iowa 1984)); *see also Kelly v. Iowa State Educ. Ass'n,* 372 N.W.2d 288, 295 (Iowa Ct.App. 1985) (rejecting, based on Iowa case law, defendants' argument that "writings cannot be libelous per se because no derogatory meaning is present in the statements themselves [and that] such meaning only arises by inference"). In this case, Wegenke's comments, which were clearly directed at Plaintiff, could reasonably be understood to impugn Plaintiff's "integrity or moral character," "expose [him] to public hatred, contempt or ridicule," "deprive [him] of the benefits of public confidence and social dealings," or "injure [him] in the maintenance of his business." It was therefore proper to give the question of slander per se to the jury. *See Vinson,* 360 N.W.2d at 116 ("If the language is capable of two meanings including the one ascribed by the complainant, it is for the jury to say whether such meaning was the one conveyed.").

■ As to the Job audit, it is unlikely the audit reasonably could be understood as defamatory per se. According to Smith, the audit questioned his competency as a manager because it showed, among other things: (1) the technology depart-

---

**2.** Significantly, the Defendant in its motion has not challenged the jury's damage award;

it merely takes issue with the jury's finding of liability.

ment was over budget by half a million dollars; (2) records were not adequately maintained; (3) funding allocations were not followed; (4) computer equipment was not stored or inventoried properly; (5) there were no maintenance records; (6) travel costs in the technology department were excessive; (7) computers were missing; (8) technology items that had been stolen were not reported as such; (9) travel costs were excessive; (10) teachers were taking home computers in violation of state law; (11) curriculum software was being purchased without proper approval. These findings were widely reported in *The Des Moines Register. See* Pl.'s Ex. 60. The audit did not mention Smith by name but blamed his office or his department. At trial, Smith showed how in some instances the audit overstated the problems in the technology department.[3]

Assuming true the contention that the audit was overly critical and partially inaccurate, the Court cannot agree that the audit was slanderous per se. The Court is mindful that Job's audit may have contained some errors in calculation or overstated certain of its conclusions. These objections, however, go more to the audit's methodology and not to the substantive import of the study.

The fact the audit was highly critical of the technology department does not render that document slanderous per se. Audits, by their nature, are supposed to be critical. *See, e.g.,* Iowa Code § 11.4 (audits of executive branch departments must "set out in detail" the "actual condition of [the] department," including the department's use of funds, the efficiency of operations, whether "illegal or unbusinesslike practices" goes on, and ways the depart-

ment can improve). Smith himself wanted a critical assessment of his department "so we could address the issues of what I might be overlooking, and also to close ... the books on the time periods for myself and see ... how do I fix all the problems and establish confidence both with the board and public." (Smith testimony, Trial Tr. 3/22/00). Although Smith had been calling for an audit of the department as early as Spring 1996, it was Smith's friend and ally on the school board, Suzette Jensen, who initiated the internal audit. In her July 10, 1996 letter to Superintendent Wegenke, Suzette wrote in part: "Dear Gary: I am requesting an internal review of the technology department to assess the accountability and controls for property (both software and hardware) management. I understand the Director of Technology, Ron Smith, has also made this same request." Job's audit came down hard on the Plaintiff in his institutional capacity as director of the technology department. Such a critique was not only expected but in large measure desired by Plaintiff himself.

Properly viewed, the audit could not have reasonably been understood as a personal attack by the District on Smith's integrity or moral character. Nor could it reasonably have exposed him personally to public hatred, contempt or ridicule, or deprived him of the benefits of public confidence, or injured him in the maintenance of his business. Thus, as a matter of law, the audit was not slanderous per se. To the extent the audit could be seen as defamatory, the school district enjoys at least a qualified privilege, *see Ryan v. Wilson,* 231 Iowa 33, 300 N.W. 707 (1941) (governor who initiated audit of receivership divi-

---

**3.** For instance, Smith claims that had Job properly carried money over from the previous fiscal year, the audit would have revealed the technology department to be under-budgeted by $180,000. Similarly, Smith takes issue with the audit's portrayal of "excessive" travel costs in the department. Testimony at trial revealed that some teachers were quite frugal with district money, car pooling to conferences and sharing hotel rooms.

sion of the state department of banking enjoyed absolute and unqualified privilege; alternatively he had qualified privilege to release audit to the press), which privilege has not been defeated by any showing of actual malice.

### B. Actual malice

As to Wegenke's August 27, 1996 comments, the District argues, and Smith agrees, that it is entitled to the protection of a qualified privilege. *See Vojak*, 161 N.W.2d at 105. That aspect of this case is not contested.

■ The parties do dispute, however, whether actual malice exists because "[p]roof of actual malice destroys the qualified privilege of a publication." *Id.* Plaintiff carries the burden to show actual malice by "clear and convincing proof." *Johnson v. Nickerson*, 542 N.W.2d 506, 512 (Iowa 1996). The Court instructed the jury that statements made with actual malice are those made "with ill-will or wrongful motive;" and that actual malice "can be shown by proving knowledge of a false statement or reckless disregard for the truth." *See* Instruction No. 16. The District did not object to this instruction.[4]

■ After reviewing all of the testimonial and documentary evidence admitted at trial, the Court concludes that substantial evidence exists to support the jury's determination that the Defendant, acting through its agents, acted with actual malice. As the Court has determined that Job's audit is not slanderous per se, the Court need only concern itself with Weg-

---

4. There is some confusion in the Iowa case law regarding the proper standard for determining actual malice. Some Iowa cases adopt the standard enunciated in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), wherein the Court held that a public official, in order to recover defamatory damages from a media defendant, had to show knowledge of falsity or reckless disregard for the truth. *See, e.g., Anderson v. Low Rent Hous. Comm'n*, 304 N.W.2d 239, 247 (Iowa 1981) (fired city secretary, in libel action against city housing commission, had to show actual malice under the *New York Times* standard); *id.* (*New York Times* standard "applies to both media and nonmedia defendants in an action for libel"); *Blessum v. Howard Cty. Bd. of Supervisors*, 295 N.W.2d 836, 843 (Iowa 1980) (fired county engineer, in slander action against board of supervisors, had to show actual malice under the *New York Times* standard); *see also* Patrick J. McNulty, *The Law of Defamation: A Primer for the Iowa Practitioner*, 44 Drake L.Rev. 639, 671–73, & 724 (1996) (*New York Times* actual malice standard applies in any defamation action where the plaintiff is either a public official, public figure, or a private figure objecting to statements addressing a matter of public concern). To compound the confusion, Iowa Civil Jury Instruction No. 2100.4 directs that the knowledge of falsity/reckless standard be used "in the limited context when the plaintiff has alleged libel and the court has determined as a matter of law that the statements are not libel per se."

*Compare King v. Sioux City Radiological Group, P.C.*, 985 F.Supp. 869, 879–80 (N.D.Iowa 1997) (discharged administrator, in a defamatory action against hospital, can prove actual malice by demonstrating ill-will, wrongful motive, or the *New York Times* standard of reckless disregard for the truth); *Taggart v. Drake Univ.*, 549 N.W.2d 796, 804 (Iowa 1996) (in a defamation action by a terminated assistant professor of art against a university, actual malice "requires proof that the statement was made with ill will or wrongful motive" and "occurs when a statement is made with knowledge that it is false or with reckless disregard for its truth or falsity") (citations omitted); *Haldeman v. Total Petroleum, Inc.*, 376 N.W.2d 98, 103–04 (Iowa 1985) (actual malice that plaintiff needed to show to remove defendant's qualified privilege defined as "ill-will or wrongful motive"); *Vinson*, 360 N.W.2d at 117–18 (fired bus driver, in slander action against school district and other district officials, needed to prove actual malice through a showing of "ill-will or wrongful motive").

Notwithstanding these inconsistencies, the Court's jury instruction fairly addressed the actual malice standard as it is applied in the reported cases.

**1052**

enke's remarks made at the August 27, 1996 school board meeting.

Plaintiff's theory of the case, in a nutshell, is that Wegenke's statements "were made to discredit Ron Smith and to ultimately make him the scapegoat for the gross mismanagement of Dr. Wegenke's administration." Pl.'s Br. in Supp. of Resistance to Defendant's Mot. for J. as a Matter of Law at 24. "[The District] had a mind-mannered scapegoat, the perfect guy, an assailant. Who's going to believe the word of a guy who beats up women?" Trial Tr., 3/24/00. The evidence in support of this theory included the following:

First, Plaintiff offered substantial evidence respecting his competence for the position of technology director and his overall character. Smith entered the District with solid work and education credentials.[5] Smith's references that he submitted for the director of technology position all spoke highly of him; none stated he was unsafe, aggressive, or violent. The parties stipulated that Smith beat out 130 applicants from across the United States for the job. In his first year evaluation, Smith received a positive assessment from Tom Stokes, the District's Director of Human Resources Management. In a draft letter dated June 30, 1996—two days prior to the file incident with Dinsdale—Stokes wrote that Smith "demonstrated considerable skills" in guiding the District in technology and that Smith "rightly deserve[s] to be proud of [his] accomplishments in that regard." In her deposition, Dinsdale could not recall that Smith had "ever done anything that [she] would characterize as aggressive or in any manner appeared violent before [the July 2, 1996 file incident]." Dinsdale Depo. at 128.

Although Wegenke consulted with the District's outside counsel before making his August 27, 1996 statement to the school board, he did not perform his own investigation of the incident, talk with witnesses, or review personnel files. At trial, Wegenke denied the characterization that Smith was "unsafe." When asked what he meant by his August 27 remarks, Wegenke stated: "I'm simply saying as an administrator it's important for us to model the appropriate kinds of behaviors that we expect of our staff whatever they may be in the district as well as model the behavior of our students." Trial Tr., 3/24/2000.

That's a respectable afterthought, and had he said these words, Plaintiff probably wouldn't have a case. But the words Wegenke used did more than say the District disapproved of inappropriate behavior. Directly referencing Plaintiff by name and the July 2 file incident, Wegenke stated he would not *"tolerate* an *unsafe* workplace for our employees" and that "the settlement with Smith was motivated on the district's side of employee *safety* in the workplace." Those are strong words and the jury reasonably gleaned from them a defamatory message. Given Smith's exemplary record with the District and the absence of any independent review of the matter by the District, the jury reasonably could have discounted Wegenke's sincerity and believed that he entertained "serious doubts as to the truth of his publication," which would mean he acted in reckless disregard of the truth. *Kelly,* 372 N.W.2d at 298 (citing *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)); *see also Harte–Hanks Communications, Inc., v. Connaughton,* 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) ("[A]lthough failure to investigate

---

**5.** He holds a B.S. in Math and an M.B.A. degree. Prior to joining the District, he spent four years as the Director of Information Technology of the Kansas City School Dis-

trict. At the time of his hiring, he had 22 years of Management Information Systems experience.

will not alone support a finding of actual malice, ... the purposeful avoidance of the truth is in a different category.").

Second, there was evidence to suggest a rift between Smith and Wegenke. By letter dated June 6, 1996, Smith expressed to Wegenke that there was a "coordinated effort" to "block" and "limit" Smith's efforts to implement the District's technology plan. Pl.'s Ex. 66. Smith expressed his frustrations that he had "been told not to talk to board members and asked to censor [his] convictions about the technology problems we face." Smith was upset that Wegenke had announced a technology summit without consulting Smith first: "We paid a world class consultant firm $300,000 for technical guidance, and a group of non technical people are going to decide what the best professional has already provided? What kind of a district is this, to make such a decision without the presence of the Director? It can only be that there is an effort to restrict the influence of your Director of Technology." *Id.* At another point in the letter, Smith addressed accusations of "being under the influence of [board member] Suzette Jensen": "Now, what kind of accusation is that? Why do you, Pat and a few other administrators think that ... ? It happens to not be true. Do you think that I can't think for myself? What an insult to my professional integrity! * * * I regard this accusation about Suzette as a slander and an attempt to damage my professional reputation." *Id.*

Clearly, the rift between Smith on the one hand and Wegenke on the other had grown fairly wide by the time Smith had penned his June 6, 1996 letter to Wegenke. In fact, Smith testified that in a June 4, 1996 meeting with Wegenke and Moran, "one of the first things that Gary Wegenke said to me [was:] 'Ron, what is it going to take to get you on the same page as us?'" (Trial.Tr., 3/21/2000.) Smith's problems with Wegenke and his administration, and the apparent animosity such problems engendered, was sufficient evidence of "illwill" or "wrongful motive" behind Wegenke's decision to explain Smith's discharge in a way the jury found slanderous. *See Vojak,* 161 N.W.2d at 107 (sufficient evidence "from which the jury might find defendant was seeking to relieve its own failure by falsely accusing plaintiff of incompetence").

Finally, Wegenke's credibility was further called into question after he stated he condoned, what Plaintiff termed, a "secret file" that had been kept on Smith. At trial, it was shown that at some point in early 1996, District secretary Dinsdale began to monitor the activities of Smith and keep these notes in a locked file cabinet. According to Dinsdale, Assistant Superintendent Moran told her to "document everything that you see, everything that you observe" about Smith. Dinsdale Depo. at 160.[6] Moran wanted Smith watched because of "some conflicts among .... Ron's staff and the technology department ... [and because] there was a concern about people showing up for appointments, and Ron would not be in the office or not in the building ..." *Id.* at 154.[7] Dinsdale would

---

**6.** Moran initially ordered only Smith to be monitored. After Smith hired two specialists from outside the District to help him on technology matters, Moran also instructed Dinsdale to track the activities of these two individuals. *See* Dinsdale Depo. at 155–56. Dinsdale could not recall ever being told by Moran to keep such files on anybody else. *Id.* at 161.

**7.** In his case-in-chief, Plaintiff sought to establish that the directive to track his activities and conversations was also a response to some high-profile, unpopular decisions Smith made which upset many in the District. For example, (1) Smith hired from outside the District two specialists to work with him on technology matters; (2) he placed a moratorium on all computer hardware and software purchases for three "demonstration schools";

meticulously record the time Smith would enter and leave the office, transcribe the substance of conversations he would have with people either in person or on the phone, and make general comments about his activities. Typically, these notations were addressed to Pat Moran or another office secretary before being filed. When Moran was out of the office, Dinsdale was "his ears and eyes." *Id.* at 184.

Wegenke would not learn of these files until the day of Smith's confrontation with Dinsdale on July 2, 1996. At trial, Wegenke stated that it "did not surprise" him that Moran was maintaining such a file on Smith. Wegenke denied the file kept on Smith was a "secret" file. Wegenke approved of the file on Smith, offering this explanation: "When you're attempting to put together an evaluation at the end of the year, incidents happen over the month, both positive types of incident as well as things that might be classified as negative. So when you sit down at the end of the year and do the administrative evaluation you open the file and begin to put the contents together. It becomes kind of a memory check for yourself." (Trial Tr., 3/24/2000.) Given the bizarre nature of Smith's file-bizarre because it was covertly maintained and unlimited in scope-the jury reasonably could have discounted the sincerity of Wegenke's statements that the file was a non-secretive and appropriate employee evaluation tool.

The Court has discussed these so-called "secret" files in more detail than is probably necessary because they provide another context against which the jury assessed Wegenke's credibility in his overall handling of Smith's termination. *See Kelly,* 372 N.W.2d at 299 (all circumstances must be considered in determining whether actual malice was proved) (citing *Melton v. Bow,* 145 Ga.App. 272, 273, 243 S.E.2d 590 (1978)).

In light of the foregoing discussion, the Court cannot say that the jury was unreasonable in finding that the Defendant, acting through Wegenke, slandered Plaintiff with actual malice. Nor can the Court conclude there was insubstantial evidence upon which the jury could base its finding.

### C. Truth or substantial truth

 Defendant's final contention is that the "underlying facts as to the gist or sting of the defamatory charge are undisputed and substantially true as a matter of law." Def.'s Br. in Supp. of its Mot. for J. as a Matter of Law at 15 (hereinafter "Def.'s Brief"). As the Court stated above, and as explained to the jury, "[t]he fact the statement is true or substantially true is a complete defense, regardless of bad faith or malicious purpose." Iowa Civil Jury Instruction 2100.6; *see also Behr v. Meredith Corp.,* 414 N.W.2d 339, 342 (Iowa 1987).

The Defendant claims Wegenke's August 27 statement did not accuse Smith of being "unsafe." Rather, it "simply explained the administration's justification for recommending the settlement agreement and accepting the resignation; i.e. safety in the workplace." Def.'s Brief at 14. To the Plaintiff, the statement suggested he was "unsafe"—a characterization he claims is not true. The jury agreed with the Plaintiff. In reviewing the evidence in this case, the instruction the Court gave to the jury on this question, and the standard which this Court must apply to Defendant's Rule 50 motion, the Court is satisfied with the jury's finding on this issue. It was a reasonable conclusion the jury reached based on the evidence.

### D. Motion for New Trial

 The Defendant has also moved for a new trial under Rule 59. As the preced-

---

and (3) he began a shift away from Macintosh computers to IBM-compatible computers.

ing discussion has made clear, with the exception of the audit, the Court is satisfied that the evidence in this case supports the jury's ultimate finding as to liability and damages. The jury's verdict is not against the great weight of the evidence nor did it result in a miscarriage of justice; thus, a new trial is not necessary. *See White v. Pence*, 961 F.2d 776, 779 (8th Cir.1992).

## IV. Conclusion

Based on the foregoing reasons, the Defendant's Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial is **denied.**

IT IS SO ORDERED.